VIRGINIA

# FILED

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

AUG 0 3 2010

JOHN T. FREY
Clerk of the Circuit Court
of Fairfax County, VA

| | |
|---|---|
| BEST MEDICAL INTERNATIONAL, INC., a Virginia Corporation; HUESTIS MACHINE CORP., a Rhode Island Corporation, GUNSTON HALL REALTY, a Virginia Corporation; BEST INDUSTRIES INC., a Virginia Corporation and KRISHNAN SUTHANTHIRAN, an individual, | : : : : |

CASE NO.

**2010    10997**

Plaintiffs,                                                          :

V.                                                                         :

WELLS FARGO INC, NA, as successor in interest    :
to WACHOVIA BANK, N.A and
J. KENT THOMPSON, an individual,                          :

Serve:  C/o State Corportion Commission
          R/A James E. Hanson, VP                             :
          Wells Fargo Bank NA
          6th & Marquett Ave                                        :
          Minneapolis, MN 55479
                                                                               :

Serve: J. Kent Thompson
          1753 Pinnacle Drive, 3rd Fl.                          :
          McLean, VA 22102
                                                                               :

Defendants.                                                          :

## COMPLAINT

Now comes the plaintiffs, by and through their attorney, and hereby complain against the defendants as follows:

## JURISDICTION AND PARTIES

1.      Plaintiff Best Medical International Industries, Inc. is a Virginia corporation doing

business on a regular and systematic basis in Fairfax County, Virginia . Best Medical

International, Inc. entered into a contract with the defendant Wells Fargo, NA as successor in interest to Wachovia Bank, NA to borrow and/or guarantee certain loans and lines of credit on or about July 31, 2009 (See Agreement at Exhibit 1).

2.   Plaintiff Huestis Machine Corporation, is a Rhode Island Corporation doing business in Fairfax County, Virginia. Huestis Machine Corporation also entered into a contract with the defendant Wells Fargo, NA as successor in interest to Wachovia Bank, NA to borrow and/or guarantee certain loans and lines of credit on or about July 31, 2009.

3.   Plaintiff Gunston Hall Realty, Inc. is a Virginia Corporation doing business on a regular and systematic basis in Fairfax County, Virginia. Gunston Hall Realty, Inc. entered into a contract with the defendant Wells Fargo, NA as successor in interest to Wachovia Bank, NA to borrow and/or guarantee certain loans and lines of credit on or about July 31, 2009.

4.   Best Industries, Inc. Is a Virginia Corporation, doing business on a regular and systematic basis in Fairfax County, Virginia. Best Industries, Inc. entered into a contract with the defendant Wells Fargo, NA as successor in interest to Wachovia Bank, NA to borrow and /or guarantee certain loans and lines of credit on or about July 31, 2009.

5.   Krishnan Suthanthiran is an individual who is sole owner, sole shareholder and CEO for plaintiffs Best Medical International, Huestis Machine Corporation, Gunston Hall Realty, Inc. and Best Industries, Inc. and is a resident of Fairfax Country Virginia and is also an individual of Indian descent and therefore a member of a protected class of persons as defined by various statutes as described below.

6.   Defendant, Wells Fargo Bank, National Association is a foreign Corporation that does business on a systematic and regular basis in Fairfax County, Virginia and on or about December 31, 2008 purchased and became a successor in interest to Wachovia Corporation. The

individual defendant, J Kent Thompson is employed by the defendant Wells Fargo as an executive Vice President and does business in Fairfax County, Virginia

7.     That on or about July 31, 2009 Wells Fargo Bank, NA, as successor in interest to Wachovia assumed obligations as the 'Lender' pursuant to a Waiver and Amendment Agreement between Wachovia Corporation and the plaintiffs. Said loan agreement pertained to loans and/or lines of credit to the plaintiff in sums totaling $15,000,000.00 in the aggregate. A copy of said agreement is attached hereto.

8.     That the transactions and/or occurrences related to this cause of action occurred in Fairfax County, Virginia pursuant to Va. Code Ann § 8.01-26 2 (4).

9.     That jurisdiction and venue relative to this matter is therefore proper in Fairfax County Circuit Court, Commonwealth of Virginia

## FACTUAL ALLEGATIONS

10.     Plaintiff hereby incorporates by reference preceding paragraphs 1-9.

11.     The parties have a thirty plus year banking relationship that includes long-term loans, lines of credit loans and guarantees for repayment..

12.     Prior to Wells Fargo Bank, N.A. purchase of Wachovia Corporation the relationship was productive and profitable for all parties. This included regular renewals of debt and lines of credit available to the plaintiff's based on their excellent repayment record and sound business practices. In fact, defendant affirmatively solicited the plaintiffs business relative to loans because of the plaintiff's excellent repayment history and record of business growth, acumen and profitability.  Specifically, plaintiffs had the following term loans and credit lines as of January, 2009:

A.     a term loan to Heustis Machine Corp for $5,000,000.00;

B.      a term loan of $2,000,000.00 to Huestis;

C.      a line of credit to Gunston Hall Realty for $5,000,000.00; and

D.      a line of credit to Best Medical International for $5,000,000.00

13.     After defendant Wells Fargo purchased Wachovia the relationship between the parties deteriorated significantly.

14.     Specifically, defendant Wells Fargo Bank, NA refused to agree to renewals or extensions of the debt, demanded increase percentage rates, unreasonably demanded immediate pay off of the loans demanded 10 million of additional collateral and pre-payment penalties, made unrealistic demands for the time allowed to obtain requested information and signing closing documents and included in the agreement onerous conditions such as a confessed judgment provision in the event of default, certain waivers and/or releases of claims as well as the right to a jury trial relative to disputes.

15.     On July 31, 2009, by virtue of the execution of the Waiver agreement, plaintiff(s) were compelled to agree to the aforementioned onerous terms. The plaintiff had already borrowed the funds under the prior practice of routine yearly renewals and the money was invested in the operations and expansion of the plaintiff's business interests.

16.     The defendant's knew the purposes for which the plaintiff(s) procured the loans and invested the funds.

17.     When the Waiver Agreement expired in January, 2010 the defendant refused to renew the loan instead making unreasonable demands for immediate information and collateral.

18.     In April, 2010 the plaintiffs offered, and in fact paid an additional $250,000.00 per month of additional principal on the term loans and credit lines as a demonstration of their good faith and noted that the payments would be in exchange for a six month extension for

repayment while other financing was investigated with the defendant and/or other lenders. Plaintiff has paid over $1,000,000.00 on the notes which was contingent on the loan being renewed. Plaintiff cashed the extra payments yet continues to refuse to extend the loan. In fact the plaintiff has made $500,000.00 worth of payments since the defendant has filed a confessed judgment.

19.     On May 6, 2010 plaintiffs again contacted the defendant J. Kent Thompson reiterating its good faith efforts to pay significant sums toward retirement of the debt while attempting to renegotiate and/or refinance. Plaintiff further requested a meeting with the individual responsible for making the decision relative to the loan extension or renewal however the plaintiff's good faith efforts were ignored by defendant Thompson.

20.     Defendant however continued to unreasonably deny these efforts despite Plaintiff's continuing stellar repayment history over six years and past practices of routinely granting extensions and renewals.

21.     On June 24, 2010 Plaintiff Krishnan Suthanthiran contacted defendant bank's senior Vice President, defendant J. Kent Thompson and informed him that he believed the banks actions was the result of racial (and/or national origin) discrimination.

22.     Defendant, each and all of them, then retaliated against plaintiff Suthanthiran for making a civil rights complaint by on or about June 30, 2010 by filing confessed judgments against the plaintiff's despite plaintiffs excellent past record of payments to the defendant bank.

## COUNT I

## VIOLATION OF THE VIRGINIA
## EQUAL CREDIT OPPORTUNITY ACT

23.     Plaintiff hereby incorporates by reference all prior paragraphs 1-22

24.     The credit transactions and request for renewal as described above is subject to

the Virginia Equal Credit Opportunity Act , Va. Code § 59.1-21.21:1 which states:

> It shall be unlawful for any creditor to discriminate against any
> applicant, with respect to any aspect of a credit transaction

(1) On the basis of race, color religion, national origin, sex or marital status of
age.

25.     The defendant bank has an established history of discriminating against minority

lenders. For example, the State of Illinois' Attorney General has sued Wells Fargo, NA

because their subpoenaed information relative to their business practices has shown

that minority borrowers received less favorable terms than white borrowers

and that Wells Fargo disproportionately steered minority borrowers into high cost loans,

*See* Illinois v Wells Fargo N.A., Cook County Circuit Court, Case No. 09 CH 26434 filed

on July 31, 2009. Closer to home, in the lawsuit of Baltimore v Wells Fargo, NA the

plaintiffs data demonstrates that Wells Fargo targeted minorities in Baltimore and the

Washington D.C. area with higher cost loans and employee whistleblowers have

testified that Wells Fargo personnel verbalized racial slurs and innuendo relative to

these loans, *See* Mayor and City of Baltimore v Wells Fargo, NA, United States District

Court, District of Maryland, Baltimore Division, Case No. 1:08 cv 00062-JFM. Similar

lawsuits suits against the defendant have been filed throughout the country and the

NAACP has recently settled a similar matter with Wells Fargo. The data provided in these cases

demonstrate a corporate mentality and culture willing to intentionally discriminate by abiding to

lending policies that have a discriminatory impact upon minority borrowers or treat minority

borrowers in a disproportionately adverse manner than non minority customers.

26.     Defendants intentionally discriminated against the plaintiffs on

the basis of race and/or national origin in the following particulars:

    a.    Refusing to grant, or even negotiate renewals or extensions of loans and/or lines of credit to businesses with minority owners.

    b.    Requiring onerous and unfair conditions relative to the Waiver Agreement such as requiring a Confession of Judgment provision, demanding greater collateral, doubling the interest rate and demanding waivers of basic rights under law such as a jury trial to resolve disputes despite the fact that these demands were typically not made in prior years.

    c.    That the defendant implemented policies, goals, objectives and directives that were disproportionately hostile to racial and national origin minorities in that they had a negative or adverse impact on minorities. This essentially resulted in treating minority borrowers unfairly as compared to non minority borrowers. This conclusion is evidenced by data discovered in lawsuits filed in other venues involving defendant as a party.

    d.    That the defendant implemented policies, goals, objectives and directives that were disproportionately hostile to geographical areas that had concentrations of racial and national origin minorities. These policies, goals, objectives and directives resulted in a negative or adverse impact on geographical areas that included concentrations of minorities.

    e.    By retaliating against the plaintiff, Mr. Suthanthiran for making a Civil Rights complaint by unreasonably filing a confessed judgment days after the civil rights issue was raised with the defendant. To the best of plaintiff's information and belief this was decided by defendant Thompson who was accused by plaintiff Suthanthiran of civil rights violations.

    f.    That defendant Thompson ignored the plaintiff's reasonable requests to renew or extend the loan however Mr. Thompson ignored plaintiff's good faith efforts (Exhibit 2).

    g.    That any reasons stated by the defendants for refusing to fairly negotiate loan terms and/or agree to loan or line of credit extensions are pretextual and designed to hide or cover up it's adverse outcome or impact upon minorities who make loan applications.

    h.    Plaintiffs have received two term sheets from credit facilities relative to refinancing the loans in question thereby indicting that defendants conduct was not related to the plaintiffs credit worthiness.

27.    Such conduct has denied and will continue to deny Plaintiff equal protection and civil rights guaranteed by the Constitution and laws of the Commonwealth of Virginia.

28.    Defendants conduct was willful, malicious, and intentional.

29.    As a direct and proximate result of Defendants unlawful business practices and tortious acts as described above, Plaintiff has suffered damage to their reputations lost and will continue to lose substantial income including, but not limited to, business opportunity in the present, past and future.

30.    As a further direct and proximate result of Defendants unlawful business and lending practices, Plaintiff Krishnan Suthanthiran has suffered the indignity of discrimination, severe humiliation, injury to his person and feelings, loss of standing and status in the community, irreparable harm to his reputation, and invasion of his right to be free from discrimination and retaliation.

WHEREFORE, Plaintiff demands judgment of $1,000,000.00 in whatever amount he is found entitled to, plus costs, interests, and fees, including reasonable attorney and witness fees, as allowed by statute.  Also, Plaintiff requests Invalidation of Amendment and Waiver Agreement, Confessed Judgment, Guaranty Agreement.  In addition, Plaintiff requests punitive and/or exemplary damages as allowed by statute.

## COUNT II

### FRAUD AND/OR CONSTRUCTIVE FRAUD

31.    Plaintiff hereby incorporates by reference prior paragraphs 1-30.

32.    The parties had enjoyed a mutually successful business relationship for over thirty years that included a variety of loan and line of credit instruments.

33.    One year lines of credit and/or loans were routinely extended and/or renewed because the plaintiffs were historically very reliable about making timely payments on all loan instruments. In fact, defendant affirmatively solicited and pursued loan business with the

plaintiffs because of the plaintiff's impressive repayment and business record. The knowledge of said history is imputed upon the defendants as successor in interest to Wachovia. In addition, the defendant received approximately 25 billion dollars from the federal government TARP funds. On February 26, 2010 Mr. David Hoyt, Wells Fargo Head of Wholesale Banking testified before the House Financial Services Committee and the House Small Business Committee that the company is 'making credit available to credit worthy borrowers'. The plaintiffs, as creditworthy customers with an excellent repayment record, had a reasonable expectation that credit renewals would continue to be reasonably provided for their business. This expectation was reasonable based upon the defendant's words and actions. Specifically, defendant had routinely during the more that 30 year business relationship with the plaintiff renewed and/or extended loans or lines of credit. The act of routinely renewing loans while soliciting new loans amounts to a representation that defendant would continue to renew the notes as long as payments were timely made.

34.     Plaintiffs reasonably relied upon this representation and expectation by continuing to borrow from the bank and using the funds to operate and expand their businesses . In addition, the plaintiff's refrained from borrowing funds from other banks or financial institutions based upon plaintiff's reasonable belief that the loans would be renewed if payments were timely made.

35.     This reasonable reliance upon the defendant's actions was detrimental to the plaintiffs' interest in the following particulars:

   a.     Then on July 31, 2009 plaintiffs were essentially forced by all defendants to accept the unconscionable terms and conditions included in the Waiver and Amendment Agreement which are described above in order to continue their business operations

   b.     On July 2, 2010 the defendants filed confessed judgments against the

plaintiffs after their refusal to extend or renew the loans. As a result, plaintiffs' ability to obtain financing is impaired which has created an extreme hardship for plaintiff's business operations as well as their respective employees. It also depicts plaintiff in a false light so as to make it appear that plaintiff is unable to make the loan payments when in fact all regularly scheduled payments had been timely made. This in turn has damaged the business and personal reputation of the plaintiffs.

36.     The defendant's refusal to continue reasonable loan extensions under the circumstances as described above constitutes a misrepresentation and/or constructive misrepresentation of material fact.

37.     The plaintiff, each and very one of them, suffered damages when they relied upon the defendant's misrepresentations to their detriment. This factual scenario is a classic bait and switch maneuver by the defendant bank. Defendant induced the plaintiff's into accepting or guaranteeing loans that defendant solicited. As the plaintiff's accepted the loans and used the funds to expand their business the bank routinely renewed the yearly notes. Plaintiff's continued to make their payments in a timely manner. In 2009 defendant bank abruptly stopped renewing the loans. Despite the plaintiffs stellar payment record the bank forced plaintiff into an onerous amended agreement that contains increased collateral requirements increase interest rates in a declining market and waivers of basic legal rights in order to extend the loan. When the onerous amended agreement expires the bank again refuses to extend the note even after plaintiff continued to make monthly payments far in excess of the payments required under the contract. The bank then attempts to enforce foreclosure on the loan collateral though the onerous confessed judgment provision forced upon the plaintiff in the amended agreement. Defendant abruptly changed the rules of a 37 year relationship forcing a thriving, ongoing businesses that always paid their bills on time into a foreclosure action.

38.     As a direct and proximate cause of the defendants fraud and/or constructive fraud plaintiff's  have now suffered damages to their reputation, credit rating, the

cost of future financing, personal anguish and distress on the part of the individual plaintiff and the loss of business opportunity destroyed by the lack of capital financing caused or created by the defendant's wrongdoing.

WHEREFORE, Plaintiff demands judgment of $1,000,000.00 in whatever amount he is found entitled to, plus costs, interests, and fees, including reasonable attorney and witness fees, as allowed by statute. Also, Plaintiff requests Invalidation of Amendment and Waiver Agreement, Confessed Judgment, Guaranty Agreement. In addition, Plaintiff requests punitive and/or exemplary damages as allowed by statute.

### COUNT III

### EQUITABLE ESTOPPEL

39.     Plaintiff hereby incorporates by reference prior paragraphs 1-38.

40.     The defendants represented through words and actions as described above to the plaintiffs the reasonable belief that loans and credit lines would be renewed each year upon their expiration if the payments were timely made. Defendant also solicited further loans from the plaintiff throughout their long term relationship of over 30 years.

41.     Plaintiff relied on this representation by continuing to make loans and invest the funds in their business.

42.     On July 31, 2009 the defendant ceased renewing the debt and instead required the plaintiff to enter into a into a Waiver and Amendment Agreement which included drastically increased interest rates, increased collateral requirements and also required a confessed judgment provision which in the past were typically omitted.

43.     Requiring plaintiff to enter into the July 31, 2009 agreement was contrary to the

plaintiff's reasonable expectation of yearly loan renewals.

44.     Plaintiff had no choice but to enter into the Waiver and Amendment Agreement of July 31, 2009 because plaintiff had already borrowed the funds for its business operation and expansion. Plaintiff therefore was compelled to enter the agreement under economic duress.

45.     On or about June 30, 2010 the defendants filed a confessed judgment against the plaintiff after it refused to renew the notes.

46.     The defendant should be equitably restrained from asserting its rights to enter or foreclose on the judgment because the plaintiff borrowed the funds with the reasonable expectation that loans would be automatically renewed if the payments were made on time.

47.     Plaintiff made all scheduled payments in a timely manner prior to expiration of the note.

48.     Plaintiff refrained from seeking alternative financing when the defendant solicited further loans in reliance upon the past practice of renewing the debt.

49.     Defendant would be unjustly enriched if allowed to prosper by its bad faith and unfair dealings with the plaintiff.

50.     As a direct and proximate cause of the defendant's wrongdoing as described above the plaintiff suffered damages to their reputation, credit rating, personal anguish and mental distress and loss of business opportunity.

WHEREFORE, Plaintiff demands judgment of $1,000,000.00 in whatever amount he is found entitled to, plus costs, interests, and fees, including reasonable attorney and witness fees, as allowed by statute. Also, Plaintiff requests Invalidation of Amendment and Waiver Agreement, Confessed Judgment, Guaranty Agreement. In addition, Plaintiff requests punitive and/or exemplary damages as allowed by statute.

## COUNT IV

### BREACH OF CONTRACT/DUTY OF GOOD FAITH AND FAIR DEALING

51.    Plaintiff hereby incorporates by reference prior paragraphs 1-50.

52.    Defendant had a duty of good faith and fair dealing in it's performance and enforcement of the contract between the parties.

53.    Defendant breached this duty by luring the plaintiff into continuing to borrow money on yearly notes that were automatically renewed and then abruptly failing to renew them in 2009 despite timely payments on the notes. Defendant then forced onerous and unconscionable terms upon the plaintiff in order to continue the financing. After the July 31, 2009 agreement expired the defendant attempted to foreclose on the collateral for the loan.

54.    These actions result in bad faith and unfair dealing toward the plaintiff.

55.    As a direct and proximate result of the defendant's wrongdoing the plaintiff suffered economic and non economic damages including loss of business opportunity and increase cost of financing.

### RELIEF SOUGHT

WHEREFORE, Plaintiff demands judgment of $1,000,000.00 in whatever amount he is found entitled to, plus costs, interests, and fees, including reasonable attorney and witness fees, as allowed by statute. Also, Plaintiff requests Invalidation of Amendment and Waiver Agreement, Confessed Judgment, Guaranty Agreement. In addition, Plaintiff requests punitive and/or exemplary damages as allowed by statute.

**TRIAL BY JURY IS DEMANDED.**

**TRIAL BY JURY IS DEMANDED.**

**BEST MEDICAL INTERNATIONAL
INDUSTRIES INC.,
HUESTIS MACHINE CORP,
GUNSTON HALL REALTY,
BEST INDUSTRIES INC
KRISHNAN SUTHANTHIRAN**
By Counsel

Shawn R. Weingast, Esq.
Virginia State Bar No. 33259
General Counsel, Best Industries, Inc.
Ruth Bergin
Virginia Sate Bar No. 27184
7643 Fullerton Road
Springfield, VA 22153
Tel: (703) 451-2378
Counsel for Gunston Hall Realty, Inc. and Best Industries, Inc.

$Ex\ 1$

## WAIVER AND AMENDMENT AGREEMENT

THIS WAIVER AND AMENDMENT AGREEMENT (this "Agreement") is made as of the 31st day of July, 2009 (the "Closing Date"), by and among HUESTIS MACHINE CORPORATION, a corporation organized and existing under the laws of the State of Rhode Island ("Huestis"), BEST MEDICAL INTERNATIONAL., INC., a corporation organized and existing under the laws of the Commonwealth of Virginia ("Best Medical"), GUNSTON HALL REALTY, INC., a corporation organized and existing under the laws of the Commonwealth of Virginia ("Gunston") and BEST INDUSTRIES, INC., a corporation organized and existing under the laws of the Commonwealth of Virginia ("Best Industries") and KRISHNAN SUTHANTHIRAN, a resident of the State of Washington (the "Personal Guarantor"; and together with Huestis, Best Medical, Gunston and Best Industries, each being called an "Obligor" and collectively, the "Obligors") and WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, its successors and assigns (the "Lender").

### RECITALS

A.    The Obligors have entered into various credit facilities with the Lender (the "Credit Facilities" and each a "Credit Facility") and more fully described as: (i) a secured term loan in the principal amount of Five Million Dollars ($5,000,000) from the Lender to Huestis (the "Huestis Term Loan"), (ii) a secured term loan in the principal amount of Two Million Dollars ($2,000,000) from the Lender to Huestis (the "Huestis Supplemental Term Loan"), (iii) a secured line of credit in the maximum principal amount of Five Million Dollars ($5,000,000) from the Lender to Gunston (the "Gunston Line of Credit"), and (iv) a secured line of credit in the maximum principal amount of Three Million Dollars ($3,000,000) from the Lender to Best Medical (the "Best Medical Line of Credit").

B.    The Huestis Term Loan and the Huestis Supplemental Term Loan are governed by, and secured by the collateral described in that certain Financing and Security Agreement dated December 1, 2006 (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Huestis Financing Agreement") and that certain Mortgage, Assignment, Security Agreement and Fixture Filing dated December 1, 2006 by Huestis in favor of Lender, on certain property and improvements located in the town of Bristol, Rhode Island (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Huestis Mortgage").

C.    The Gunston Line of Credit is secured by (i) that certain Deed of Trust and Security Agreement dated August 5, 2005 from Best Industries in favor of Trste, Inc., as trustee for the benefit of the Lender, on certain property and improvements located in Fairfax County, Virginia (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Gunston Deed of Trust") and (ii) by that certain Deed of Trust and Security Agreement dated August 7, 2008 from Gunston in favor of Trste, Inc., as trustee for the benefit of the Lender, on certain property and improvements located in Fairfax County, Virginia (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Gunston Supplemental Deed of Trust").

D.     The Best Medical Line of Credit is governed by, and secured by the collateral described in that certain Security Agreement dated October 29, 2004 (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Best Medical Security Agreement").

E.     Each of the Credit Facilities are unconditionally guarantied by the Personal Guarantor, pursuant to one or more guaranties from the Personal Guarantor in favor of the Lender (collectively, the "Personal Guaranties" and each a "Personal Guaranty"). In addition, Best Industries has unconditionally guarantied repayment of the Best Medical Line of Credit pursuant to that certain Unconditional Guaranty dated October 29, 2004 from Best Industries in favor of the Lender (the "Best Medical Guaranty").

F.     Pursuant to those certain default letters dated May 8, 2009, the Lender has advised each of the Obligors that one or more events of defaults or defaults have occurred under the Credit Facilities (the "Existing Events of Default") and has demanded repayment of the Credit Facilities.

G.     The Obligors  have requested that the Lender waive the Existing Events of Default in order to provide the Obligors sufficient time to refinance and repay the Credit Facilities.

H.     The Lender is willing to agree to the Obligors' request on the condition, among others, that this Agreement be executed.

## AGREEMENTS

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the Obligors and the Lender agree as follows:

1.     Recitals. The Obligors acknowledge and agree that the recitals set forth herein are true and correct statements of fact, are incorporated herein, and form a substantive part of this Agreement. Unless otherwise expressly defined in this Agreement, terms defined in the Huestis Financing Agreement shall have the same meaning under this Agreement.

2.     Acknowledgements.

(a)     The Obligors each acknowledge and agree that (i) each of the loan documents executed and delivered by any Credit Party in connection with the Credit Facilities (the "Loan Documents") remain in full force and effect in accordance with the original terms, except as expressly modified hereby, (ii) the security interests and liens granted by any Obligor to Lender under the Loan Documents shall remain in place, unimpaired by the transactions contemplated by this Agreement, and Lender's priority with respect thereto shall not be affected hereby or thereby, and (iii) the Loan Documents shall continue to secure all obligations as stated therein except as expressly amended and modified by this Agreement and the Amendment Documents (as hereinafter defined).

2

Tyson01 395091v6 012845.000399

(b)   Each Obligor and Lender confirm that except as provided herein, they have not heretofore waived or modified, and have not agreed to waive or modify, any term of the Loan Documents, and any actions any Obligor takes or fails to take (including the expenditure of any funds) is voluntary, informed and taken at its own risk.

3.    Waiver.   Subject to the terms of this Agreement, Lender hereby waives the Existing Events of Defaults. Lender's agreement to waive the Existing Events of Defaults shall in no way obligate Lender to make any other modifications to the Loan Documents or to waive any Obligor's compliance with any other terms of any of the Loan Documents, and shall not limit or impair the Lender's right to demand strict performance of all other terms and covenants as of any date.

4.    Interest.   From and after the Closing Date until the Obligations are repaid in full, the unpaid balance of the each Credit Facility shall accrue interest as follows:   (a) the Huestis Term Loan and the Huestis Supplemental Term Loan shall accrue interest at the Libor Rate, plus five percent (5.0%) per annum. The Gunston Line of Credit and the Best Medical Line of Credit shall accrue interest at the Libor Market Index Rate, plus five percent (5.0%) per annum.   For purposes hereof, "LIBOR Rate" means, with respect to each Interest Period, the rate for U.S. dollar deposits with a maturity equal to one month, as reported on Telerate Successor page 3750 as of 11:00 a.m., London time, on the second London business day before such Interest Period begins (or if not so reported, then as determined by Bank from another recognized source or interbank quotation). For purposes hereof, "LIBOR Market Index Rate", for any day, means the rate for 1 month U.S. dollar deposits as reported on Telerate Successor page 3750 as of 11:00 a.m., London time, on such day, or if such day is not a London business day, then the immediately preceding London business day (or if not so reported, then as determined by Lender from another recognized source or interbank quotation).   For purposes hereof, "Interest Period" means, each period commencing on the last day of the immediately preceding Interest Period and ending on the same day of the month that interest in respect of such Advance is due one (1) month thereafter for the then applicable interest rate; provided any Interest Period that ends in a month for which there is no day which numerically corresponds to the last day of the immediately preceding Interest Period shall end on the last day of the month and (iii) any Interest Period that would otherwise extend past the maturity date of a Credit Facility shall end on the last day of the Extension Period.

5.    Outstanding Loan Amounts.   The Obligors agree that as of July 23, 2009, (a) the outstanding principal balance under the Huestis Term Loan is $4,030,709.82, accrued and unpaid interest is $5,686.94, (b) the outstanding principal balance under the Huestis Supplemental Term Loan is $1,881,768.06, and unpaid interest is $2,654.99, (c) the outstanding principal balance under the Gunston Line of Credit is $4,286,312.90, and unpaid interest is $12,900.17 and the aggregate face amount of all outstanding Letters of Credit under the Gunston Line of Credit is $591,053.25, (d) the outstanding principal balance under the Best Medical Line of Credit is $2,719,136.72, and unpaid interest is $2,937.42, (e) the aggregate face amount of outstanding Letters of Credit for the benefit of Best Industries is $12,700.00 and (f) there are additional unpaid fees and expenses owing by the Obligors, including, without limitation, breakage fees on swap contracts The Obligors acknowledge and agree that all principal, interest and unpaid fees and expenses are due without offset or defense of any kind or nature and that as of the Closing Date, the Obligors are unable to pay such sums. The Obligors understand and agree that no

3

additional advances, letters of credit or other credit extensions of any kind or nature will be made, or issued, by the Lender during the Extension Period. Notwithstanding the foregoing, Best Medical may request advances or letters of credit under the Best Medical Line of Credit, and the Lender will in its sole and absolute discretion determine whether or not to make advances, or issue letters of credit, under the Best Medical Line of Credit.

6.    Acknowledgment of Liens.

(a)    Best Industries hereby acknowledges and agrees that the property encumbered by the Gunston Deed of Trust is and shall remain in all respects subject to the lien, charge and encumbrance of the Gunston Deed of Trust, and nothing herein contained, and nothing done pursuant hereto, shall adversely affect or be construed to adversely affect the lien, charge or encumbrance of, or warranty of title in, or conveyance effected by the Gunston Deed of Trust, or the priority thereof over other liens, charges, encumbrances or conveyances, or to release or adversely affect the liability of any party or parties whomsoever who may now or hereafter be liable under or on account of the Gunston Line of Credit or any of the Loan Documents, nor shall anything herein contained or done in pursuance hereof adversely affect or be construed to adversely affect any other security or instrument held by the Lender as security for or evidence of the indebtedness evidenced and secured thereby.

(b)    Gunston hereby acknowledge and agree that the property encumbered by the Gunston Supplemental Deed of Trust is and shall remain in all respects subject to the lien, charge and encumbrance of the Gunston Supplemental Deed of Trust, and nothing herein contained, and nothing done pursuant hereto, shall adversely affect or be construed to adversely affect the lien, charge or encumbrance of, or warranty of title in, or conveyance effected by the Gunston Supplemental Deed of Trust, or the priority thereof over other liens, charges, encumbrances or conveyances, or to release or adversely affect the liability of any party or parties whomsoever who may now or hereafter be liable under or on account of the Gunston Line of Credit or any of the Loan Documents, nor shall anything herein contained or done in pursuance hereof adversely affect or be construed to adversely affect any other security or instrument held by the Lender as security for or evidence of the indebtedness evidenced and secured thereby.

(c)    Huestis hereby acknowledges and agrees that the property encumbered by the Huestis Mortgage is and shall remain in all respects subject to the lien, charge and encumbrance of the Huestis Mortgage, and nothing herein contained, and nothing done pursuant hereto, shall adversely affect or be construed to adversely affect the lien, charge or encumbrance of, or warranty of title in, or conveyance effected by the Huestis Mortgage, or the priority thereof over other liens, charges, encumbrances or conveyances, or to release or adversely affect the liability of any party or parties whomsoever who may now or hereafter be liable under or on account of the Heustis Term Loan, the Huestis Supplemental Term Loan or any of the Loan Documents, nor shall anything herein contained or done in pursuance hereof adversely affect or be construed to adversely affect any other security or instrument held by the Lender as security for or evidence of the indebtedness evidenced and secured thereby.

(d)    Huestis and Best Medical each hereby reaffirms, acknowledges and agrees that the liens and security interests granted by the Huestis Financing Agreement and the Best

4

Medical Security Agreement shall continue as valid and binding fist priority liens and security interests in the Collateral described therein. Notwithstanding anything provided in any of Loan Documents to the contrary, Huestis and Best Medical hereby agree that the liens and security interests created pursuant to the Huestis Financing Agreement and the Best Medical Security Agreement in favor of the Lender shall secure all of the Obligations. For purposes hereof, "Obligations" are all of the Obligors' obligations to pay when due any debts, principal, interest, expenses and other amounts any Obligor owes Lender now or later, whether in under this Agreement, the Credit Facilities, the Loan Documents, or otherwise, including, without limitation, all obligations relating to letters of credit (including reimbursement obligations for drawn and undrawn letters of credit), and cash management services, if any, and including interest accruing after insolvency proceedings begin and debts, liabilities, or obligations of any Credit Party assigned to Lender, and the performance of each Obligor's duties under the Loan Documents.

7.    Payments of Principal and Interest During the Extension Period.  Except as otherwise set forth in this Agreement, during the Extension Period, all of the Credit Facilities shall continue to repaid in accordance with the Loan Documents.

8.    Affiliate Guaranties.  Best Medical International, Inc., a Delaware corporation, Brachytherapy Services, Inc., a Virginia corporation, Best Medical Engineering, Inc., a Virginia corporation, Best Medical Research, Inc., a Virginia corporation CNMC Co., Inc., a Tennessee corporation, Best Vascular, Inc., a Delaware corporation, Best Theratronics, Inc., a Virginia corporation, One Best Drive, L.P., a Pennsylvania limited partnership, and Arplay USA, Inc., a Virginia corporation (each an "Affiliate Guarantor" and collectively the "Affiliate Guarantors") shall execute and deliver to the Lender a Guaranty of Payment Agreement in substantially the form of Exhibit A attached hereto (the "Affiliate Guaranty") pursuant to which they shall jointly and severally guaranty repayment in full of the Obligations.

9.    Huestis, Best Industries, Gunston and Best Medical Guaranties.  Huestis, Best Medical, Gunston and Best Industries shall execute and deliver to the Lender a Guaranty of Payment Agreement in substantially the form of Exhibit B attached hereto (the "Restated Best Industries Guaranty") pursuant to which they shall jointly and severally guaranty repayment in full of the Obligations.

10.    Personal Guaranty.  The Personal Guarantor shall execute and deliver to the Lender a Guaranty of Payment Agreement in substantially the form of Exhibit C attached hereto (the "Restated Personal Guaranty") pursuant to which he shall guaranty repayment in full all of the Obligations.

11.    Pledge Agreements.

(a)    On the Closing Date, as additional collateral for the Obligations, the Obligors shall cause Arplay USA, Inc., a Virginia corporation ("Arplay USA") to execute and deliver to Lender, a Pledge and Security Agreement in substantially the form of Exhibit C attached hereto (as thereafter amended, restated, substituted or otherwise modified the "French Pledge Agreement"), which French Pledge Agreement shall grant the Lender a first priority lien in sixty-five percent (65%) of the beneficial interest of Arplay USA in Arplay Medical SAS,

5

which as of the Closing Date is _____ (_____) shares of the common stock of Arplay Medical SAS (the "French Stock Collateral"). In addition, Arplay USA shall deliver to the Lender on or before August 7, 2009, the original certificates representing the French Stock Collateral, together with stock powers and such other documents as Lender requires to perfect its lien on the French Stock Collateral.

(b)    On the Closing Date, as additional collateral for the Obligations, the Obligors shall cause Best Theratronics, Inc., a Virginia corporation ("Best Theratronics") to execute and deliver to Lender, a Pledge and Security Agreement in substantially the form of Exhibit D attached hereto (as thereafter amended, restated, substituted or otherwise modified the "Canadian Pledge Agreement"), which Canadian Pledge Agreement shall grant the Lender a first priority lien in sixty-five percent (65%) of Best Theratronics' beneficial interest in Best Theratronics Ltd., a Canadian corporation, which as of the Closing Date is _____ (_____) shares of the common stock of Best Theratronics Ltd. (the "Canadian Stock Collateral"). In addition, on or before July 31, 2009, Best Theratronics shall deliver to the Lender on such date, the original certificates representing the Canadian Stock Collateral, together with stock powers and such other documents as Lender requires to perfect its lien on the Canadian Stock Collateral.

12.    Deeds of Trust.

(a)    Not later than July 28, 2009, as additional collateral for the Obligations, Best Industries shall execute and deliver to the Lender a Deed of Trust, Assignment, Security Agreement and Fixture Filing in the form attached hereto as Exhibit E (as thereafter amended, restated, substituted or otherwise modified the "Renaissance Fair Deed of Trust"), which Renaissance Fair Deed of Trust shall encumber and constitute a first priority lien on certain property located in Stafford County, Virginia (the "Renaissance Fair Property") and shall be immediately thereafter recorded in the land records of Stafford County, Virginia, at the Obligors' expense. The principal amount secured by the Renaissance Fair Deed of Trust will be limited to Six Million Dollars ($6,000,000). In addition, at the time of the delivery of the Renaissance Fair Deed of Trust, the Lender shall have received a paid policy of title insurance on the current ALTA Form or a valid and enforceable commitment to issue the same, from a company satisfactory to the Lender in the amount of the Renaissance Fair Deed of Trust and which may be endorsed or assigned to the successors and assigns of the Lender without additional cost, insuring the lien of the Renaissance Fair Deed of Trust to be a valid first lien on the Renaissance Fair Property, free and clear of all defects, exceptions and encumbrances except those permitted under the Renaissance Fair Deed of Trust and containing affirmative insurance against such matters as the Lender may require. In addition, the Lender shall receive evidence satisfactory to the Lender of hazard and liability coverage on the Renaissance Fair Property. The Obligors shall have paid all recording fees and taxes, title costs, appraisals and surveys legal fees and expenses now or hereafter incurred by the Lender.

(b)    Not later than July 28, 2009, as additional collateral for the Obligations, the Personal Guarantor shall execute and deliver to the Lender a Deed of Trust, Assignment, Security Agreement and Fixture Filing in the form attached hereto as Exhibit F (as thereafter amended, restated, substituted or otherwise modified the "Interchange Deed of Trust"), which Interchange Deed of Trust shall encumber and constitute a first priority lien on certain property

6

located in New Kent County, Virginia (the "Interchange Property") and shall be immediately thereafter recorded in the land records of New Kent County, Virginia, at the Obligors' expense. The principal amount secured by the New Kent Deed of Trust will be limited to Six Million Dollars ($6,000,000). In addition, at the time of the delivery of the Interchange Deed of Trust, the Lender shall have received a paid policy of title insurance on the current ALTA Form or a valid and enforceable commitment to issue the same, from a company satisfactory to the Lender in the amount of the Interchange Deed of Trust and which may be endorsed or assigned to the successors and assigns of the Lender without additional cost, insuring the lien of the Interchange Deed of Trust to be a valid first lien on the Interchange Property, free and clear of all defects, exceptions and encumbrances except those permitted under the Interchange Deed of Trust and containing affirmative insurance against such matters as the Lender may require. In addition, the Lender shall receive evidence satisfactory to the Lender of hazard and liability coverage on the Interchange Property. The Obligors shall have paid all recording fees and taxes, title costs, appraisals and surveys legal fees and expenses now or hereafter incurred by the Lender.

13.   Net Income Covenant. Borrowers and the Affiliate Guarantors shall have combined net income of not less than (a) ($250,000) for the calendar quarter ending March 31, 2009, (b) $0.00 for the calendar quarter ending June 30, 2009, and (c) $1,000,000 on a combined basis for the calendar quarters ending June 30, 2009 and September 30, 2009.

14.   Appraisals. Not later than August 31, 2009, the Lender shall have received one or more appraisals, at the Obligors' expense, on the additional collateral being pledged pursuant to this Agreement, including without limitation, the Renaissance Fair Property and the Interchange Property, which appraisals shall show a combined "as is" value of the Renaissance Fair Property and the Interchange Property of not less than $7,000,000 and which appraisal shall be satisfactory to the Lender in all material respects. In the event the "as is" value shown on such appraisals is less than $7,000,000, the Obligors may within ten (10) business days of Lender's notice, provide the Lender with other collateral satisfactory to Lender having a market value (as determined by the Lender) equal to not less than the difference between $8,000,000 and such appraised value. The Obligors will reimburse the Lender for any and all expenses incurred by the Lender for any and all appraisals obtained in connection with the Obligations, within five (5) business days demand.

15.   Financial Statements. Not later than August 15, 2009, the Obligors shall provide the Lender with reviewed and consolidating fiscal year end financial statements for each of the Obligors, which financial statements shall be satisfactory to the Lender in all material respects. Obligors shall provide Lender with current quarterly financial statements for the quarters ending June 30, 2009 and September 30, 2009 not later than sixty (60) days after each quarter end. In addition, the Personal Guarantor will provide the Lender with his personal financial statements as of June 30, 2009, not later than August 31, 2009. Not later than August 26, 2009, the Obligors shall provide the Lender with the Obligors' financial statements for the calendar quarter ending March 31, 2009 which financial statements shall be satisfactory to the Lender in all material respects.

16.   Subordination Agreement. Not later than August 26, 2009, the Obligors shall deliver to the Lender a Subordination Agreement in form and substance satisfactory to the Lender and duly executed by Roynat Inc. and The Bank of Nova Scotia (collectively, the

7

"Subordinated Creditors") pursuant to which the Subordinated Creditors shall subordinate, on terms acceptable, all Obligors' now or hereafter indebtedness to Subordinated Creditors to all of Obligors' now or hereafter indebtedness to the Lender.

17.     Refinance Plan.  Obligors shall use their best efforts to cause the Obligations to be refinanced and repaid in full during the Extension Period.  Not later than August 31, 2009, Obligors shall provide Lender with a written plan in detail satisfactory to Lender for obtaining such financing.  Obligors shall provide Lender with an update of such plan on September 30, 2009 and October 30, 2009.  In addition, not later than October 30, 2009, Obligors shall provide Lender with one or more written commitments or term sheets from one or more financial institutions to refinance the entire outstanding balance of the Obligations, not later than December 15, 2009.

18.     Extension Period.  Subject to the Obligors strict compliance with the terms of this Agreement and each of the Amendment Documents, from the Effective Date through and including January 1, 2010 (the "Extension Period"), Lender shall not accelerate or take any action to collect amounts owed to it under the Loan Documents or foreclose on any lien or security interest.

19.     Repayment in Full of the Credit Facilities.  Unless sooner paid, the Credit Facilities, shall be due and payable in full by Obligors upon the earlier to occur of (i) a Termination Event (as hereinafter defined) or (ii) the termination of the Extension Period.

20.     Covenants.  During the Extension Period, each Obligor covenants and agrees with Lender that:

(a)     It will not, and will not permit any Obligor or any Affiliate Guarantor (each a "Credit Party") to, incur any other indebtedness without Lender's prior written consent, which Lender may give or withhold in its sole discretion, other than customary trade payables, and other indebtedness incurred in the ordinary course of their business; provided, however that Gunston may incur additional indebtedness from other lenders for use in connection with land development provided that (i) at the time such indebtedness is incurred no Termination Event has occurred and is continuing under this Agreement, (ii) the amount of such indebtedness in connection with the Kentland project does not exceed $350,000, (iii) the amount of such indebtedness in connection with certain construction in Nashville, Tennessee does not exceed $800,000 and amortizes on the basis of an amortization period of not less than ten years with a maturity of not less than five years.  In addition, the Personal Guarantor, Best Medical and CNMC Co., Inc. may guaranty (x) indebtedness described in clause (ii) above on an unsecured basis in an aggregate amount not to exceed $100,000 and (y) indebtedness described in clause (iii) above on an unsecured basis in an aggregate amount not to exceed $800,000;

(b)     It will not, and will not permit any Credit Party to, sell, transfer or otherwise convey any interest in any assets owned by any Credit Party, other than in the ordinary course of business;

8

(c)     It will not, and will not permit any Credit Party to, permit any liens on any of their respective assets not existing as of the date of this Agreement and disclosed to and acknowledged by Lender;

(d)     It will not, and will not permit any Credit Party to, make any transfers, loans or other distributions, other than distributions necessary to pay the actual tax liabilities of such Credit Party; and

(e)     It will promptly provide Lender with all environmental reports and other information on any environmental issues on the Renaissance Fair Property and the Interchange Property;

(f)     It will timely perform each covenant set forth in this Section 20 and each condition precedent set forth in Section 21 of this Agreement, time being of the essence.

21.    Conditions Precedent. The effectiveness of this Agreement and the extension described herein is subject to the satisfaction of each of the following conditions precedent:

(a)     The Lender's receipt of all of the Affiliate Guaranties, together with copies of the organizational documents for each Affiliate Guarantor;

(b)     The Lender's receipt of the Restated Best Medical Guaranties;

(c)     The Lender's receipt of the Restated Personal Guaranty;

(d)     The Lender's receipt of resolutions from each Affiliate Guarantor;

(e)     The Lender's receipt of the French Pledge Agreement;

(f)     The Lender's receipt of the Canadian Pledge Agreement;

(g)     The Lender's receipt of the Extension Fee; and

(h)     All legal fees and expenses of the Lender shall have been paid in full.

22.    Extension Default. The occurrence of any one or more of the following events shall constitute a default under this Agreement and shall constitute an immediate default under the Loan Documents (each, a "Extension Default"):

(a)     breach by any Credit Party of any covenant, agreement, or undertaking under this Agreement or any Amendment Document, including, without limitation, the agreements set forth in Sections 11 and 12, TIME BEING OF THE ESSENCE;

(b)     the dissolution or liquidation of any Credit Party or the death of the Personal Guarantor, as applicable, or any action taken under any federal or state law for the adjustment or reorganization of any Credit Party's financial affairs without the consent of Lender, or the entry of any order seeking the reorganization, liquidation, adjustment or arrangement of any Credit Party under any state or federal law;

9

(c)    a change in the condition or affairs (financial or otherwise) of any Credit Party that, in Lender's sole opinion, impairs the security of Lender or materially increases its risk; and

(d)    occurrence of any additional default under any of the Loan Documents.

23.    Remedies Upon Termination Event.  Upon the earlier of (such event being called a "Termination Event") (i) the occurrence of any Extension Default described in Section 22 above or (ii) the expiration of the Extension Period, at the sole discretion of Lender, Lender shall be entitled to immediately pursue any and all remedies available under applicable law or pursuant to the Loan Documents and the Amendment Documents.

24.    Extension Fee.    In consideration of Lender's agreement to enter into this Agreement and the Amendment Documents the Obligors shall pay to the Lender a non refundable extension fee (the "Extension Fee") on the Closing Date in the amount of Twenty Thousand Dollars ($20,000).

25.    Representations of Each Obligor.  Each Obligor warrants and represents to the Lender as follows:

(a)    Each Obligor has no defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against the Lender or any past, present or future agent, attorney, legal representative, predecessor-in-interest, affiliate, successor, assign, employee, director or officer of the Lender, directly or indirectly, arising out of, based upon, or in any manner connected with, any transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or began prior to the execution of this Agreement and accrued, existed, was taken, permitted or begun in accordance with, pursuant to, or by virtue of the Obligations or any of the terms or conditions of the Loan Documents, or which directly or indirectly relate to or arise out of or in any manner are connected with the Obligations or any of the Loan Documents; TO THE EXTENT ANY SUCH DEFENSES, AFFIRMATIVE OR OTHERWISE, RIGHTS OF SETOFF, RIGHTS OF RECOUPMENT, CLAIMS, COUNTERCLAIMS, ACTIONS OR CAUSES OF ACTION EXIST OR EXTEND, SUCH DEFENSES, RIGHTS, CLAIMS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION ARE HEREBY FOREVER WAIVED, DISCHARGED AND RELEASED.

(b)    Each Obligor has freely and voluntarily entered into this Agreement after an adequate opportunity and sufficient period of time to review, analyze and discuss all terms and conditions of this Agreement and all factual and legal matters relevant hereto with counsel freely and independently chosen by it. Each Obligor further acknowledges that it has actively and with full understanding participated in the negotiation of this Agreement after consultation and review with its counsel and that this Agreement has been negotiated, prepared and executed without fraud, duress, undue influence or coercion of any kind or nature whatsoever having been exerted by or imposed upon any party to this Agreement.

10

(c)    As of the date hereof, there are no proceedings or investigations pending or, so far as any Obligor knows, threatened against it, before any court or arbitrator or any governmental, administrative or other judicial authority or agency.

(d)    There is no statute, rule, regulation, order or judgment, no charter, by-law or preference stock provision with respect to any Obligor, and no provision of any mortgage, indenture, contact or other Agreement binding on any Obligor or any of its properties which would prohibit or cause a default under or in any way prevent the execution, delivery, performance, compliance or observance of any of the terms or conditions of this Agreement.

(e)    No Obligor has voluntarily or involuntarily, granted any liens or security interests to any creditor not previously disclosed to the Lender in writing on or before the date of this Agreement or taken any action or failed to take any action which could or would impair, change, jeopardize or otherwise adversely affect the priority, perfection, validity or enforceability of any liens or securing interests securing all or any portion of the Obligations or the priority or validity of the Lender's claims with respect to the Obligations relative to any other creditor of any Obligor.

(f)    Each Obligor has the full legal right, power and authority to enter into and perform its obligations under this Agreement and the other documents being delivered by any Obligor in connection with this Agreement (together with the Affiliate Guaranties, collectively, the "Amendment Documents"), and the execution and delivery of this Agreement and the other Amendment Documents by any Obligor and the consummation by the Obligors of the transactions contemplated hereby and thereby and performance of their obligations hereunder and thereunder have been duly authorized by all appropriate action (corporate or otherwise).

(g)    This Agreement, the Loan Documents and each of the other Amendment Documents to which it is a party constitutes the valid, binding and enforceable Agreement of each Obligor, enforceable against each Obligor in accordance with the terms thereof.

26.    Release of Claims. By execution of this Agreement, each Obligor, on behalf of itself and on behalf of all those entities claiming by, through, or under it, together with its successors and assigns (collectively with Obligors, the "Obligor Affiliates"), acknowledges and confirms that such party does not have any offsets, defenses, recoupments, or claims against Lender, Lender's parent company, or any of Lender's present and former affiliates and subsidiaries, predecessors in interest, present and former officers, agents, directors, attorneys and employees, and the respective heirs, executors, successors and assigns of all of the foregoing, whether past, present or future (collectively with Lender, the "Lender Affiliates"), whether asserted or unasserted. To the extent that any Obligor Affiliate may have such offsets, defenses, recoupments or claims, Obligor Affiliates, jointly and severally, release and forever discharge each Lender Affiliate of and from any and all manner of action and actions, cause and causes of action, suits, debts, torts, controversies, damages, judgments, executions, recoupments, claims and demands whatsoever, asserted or unasserted, in law or in equity which, against any Lender Affiliate, any Obligor Affiliate ever had or now has by reason of any matter, cause, causes or thing whatsoever, including, without limitation, any presently existing claim, recoupment, or defense, whether or not presently suspected, contemplated or anticipated.

11

27.   Non-Interference.  Each Obligor agrees not to interfere with the exercise by the Lender of any of its rights and remedies.  Each Obligor further agrees that it shall not seek to distrain or otherwise hinder, delay, or impair the Lender's efforts to realize upon the Collateral, or otherwise to enforce its rights and remedies pursuant to the Loan Documents.  The provisions of this Section 27 shall be specifically enforceable by the Lender.

28.   JURY TRIAL.  EACH OBLIGOR BY EXECUTION HEREOF AND LENDER BY ACCEPTANCE HEREOF, HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY RELATED AGREEMENT OR (II) IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS EVIDENCED HEREBY OR THEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND EACH OBLIGOR BY EXECUTION HEREOF AND LENDER BY ACCEPTANCE HEREOF, HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT EITHER OBLIGORS OR LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 28 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH OBLIGOR AND LENDER TO THE WAIVER OF HIS/HER/ITS RIGHT TO TRIAL BY JURY.

29.   No Waiver.  This Agreement provides for the terms pursuant to which the Lender will forbear from exercising its rights and remedies under the Loan Documents, but Lender does not waive any default or Event of Default under any other Loan Document whether arising before or after the date hereof or as a result of the transactions contemplated hereby.

30.   Consistent Changes.  The Loan Documents are hereby amended wherever necessary to reflect the changes described above.

31.   Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the heirs, successors, and permitted assigns of the parties.

32.   Governing Law and Jurisdiction.  This Agreement shall be construed and enforced in accordance with the terms of the laws of the Commonwealth of Virginia without regard to its conflicts of laws principles.  If any provision of this Agreement is not enforceable, the remaining provisions of the Agreement shall be enforced in accordance with their terms.  Each Obligor and Lender represents and warrants to each other that each is duly authorized to execute and deliver this Agreement on their respective behalves.

33.   Counterparts.  This Agreement may be executed in two or more counterparts each of which shall constitute an original and all of which shall, when taken together, constitute one and the same agreement, notwithstanding that all parties may not have signed all counterparts of this Agreement.

34.   Modifications.  This Agreement may not be supplemented, changed, waived, discharged, terminated, modified or amended, except by written instrument executed by the parties.

12

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

13

IN WITNESS WHEREOF, the Obligors and the Lender have executed this Agreement under seal as of the date and year first written above.

WITNESS/ATTEST:

HUESTIS MACHINE CORPORATION

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS/ATTEST:

BEST MEDICAL INTERNATIONAL., INC.

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS/ATTEST:

GUNSTON HALL REALTY, INC.

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS/ATTEST:

BEST INDUSTRIES, INC.

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS:

_____ (SEAL)
KRISHNAN SUTHANTHIRAN

[Signature Page to Waiver and Amendment Agreement]

WITNESS:

WACHOVIA BANK, NATIONAL
ASSOCIATION

By: _____ (SEAL)
Name: J. Kent Thompson
Title: Senior Vice President

A COPY TESTE:
JOHN T. FREY, CLERK

BY: _____
        Deputy Clerk
Date: _____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

RICHARD M. POLLAK
703.734.4354 telephone
703.448.8511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN
# SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102-
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

April 21, 2010

**BY FEDEX OVERNIGHT**
**To the parties listed below**

Re:   $5,000,000 revolving loan (the "Gunston Line of Credit") from Wells Fargo Bank, N.A., a national banking association, as successor-by-merger to Wachovia Bank, National Association (the "Lender") to Gunston Hall Realty, Inc. ("Gunston"); $3,000,000 revolving loan (the "Best Medical Line of Credit") from the Lender to Best Medical International, Inc. ("Best Medical"); $5,000,000 term loan (the "Huestis Term Loan") from the Lender to Huestis Machine Corporation ("Huestis"); $2,000,000 supplemental term loan (the "Huestis Supplemental Term Loan") from the Lender to Huestis; Letters of Credit issued by the Lender for the account of Gunston and Best Industries, Inc. ("Best Industries" and together with Gunston, Best Medical and Huestis, collectively, the "Borrowers"); and Swap Contracts between the Lender and Huestis

To each of the parties listed below:

This firm represents the Lender in connection with the above referenced matters. Pursuant to the terms of that certain Waiver and Amendment Agreement dated July 31, 2009 among the Borrowers, the Lender, and Krishnan Suthanthiran (the "Agreement"; capitalized terms used but not defined in this Letter shall have the meanings given to them in the Agreement), in connection with the above-referenced loans (the "Loans"), the outstanding principal balance of the Loans and all accrued and unpaid interest thereon became due and payable in full on January 1, 2010. Each of the parties listed below has guaranteed the payment and performance in full of the Obligations. This letter shall constitute formal notice to you that, as of the date hereof, the Lender has not yet received payment of the sums due under the Loans. Accordingly, and in accordance with the terms of the Agreement, the Lender hereby makes demand for payment in full of the Obligations.

The amount of the Obligations as of April 20, 2010 is set forth below:

|  |  |
|---|---|
| Gunston Line of Credit |  |
| Principal | $4,286,312.90 |
| Interest | $   11,882.87 |
| FINAL PAYOFF | $4,298,195.77 |
| | |
| Best Medical Line of Credit | |
| Principal | $2,819,136.72 |
| Interest | $    7,815.85 |
| FINAL PAYOFF | $2,826,952.57 |

ATLANTA   CHICAGO   HONG KONG   LONDON   NEW YORK   NEWARK   NORFOLK   ORANGE COUNTY
RALEIGH   RICHMOND   SAN DIEGO   SHANGHAI   TYSONS CORNER   VIRGINIA BEACH   WASHINGTON, DC

TROUTMAN
SANDERS

April 21, 2010
Page 2

| Huestis Term Loan | |
|---|---|
| Principal | $3,607,494.85 |
| Interest | $    10,175.40 |
| FINAL PAYOFF | $3,617,670.25 |

| Huestis Supplemental Term Loan | |
|---|---|
| Principal | $1,859,644.14 |
| Interest | $    5,151.42 |
| FINAL PAYOFF | $1,864,795.56 |

| Outstanding Letters of Credit issued for the account of Gunston | |
|---|---|
| Face Amount | $154,972.00 |
| Face Amount | $ 72,781.25 |
| Face Amount | $150,000.00 |
| Face Amount | $129,101.00 |
| Face Amount | $213,300.00 |
| TOTAL | $720,154.25 |

| Outstanding Letter of Credit issued for the account of Best Industries | |
|---|---|
| Face Amount | $12,700.00 |

| Obligations under Swap Contracts with Huestis as of March 24, 2010 | |
|---|---|
| Outstanding Amount | $612,432.00 |

Interest on each Loan continues to accrue at the applicable per diem rate set forth below:

| Loan | Per Diem Interest |
|---|---|
| Gunston Line of Credit | $625.98 |
| Best Medical Line of Credit | $411.71 |
| Huestis Term Loan | $525.96 |
| Huestis Supplemental Term Loan | $271.13 |

I urge you to make immediate arrangements satisfactory to the Lender in order to resolve this matter and to prevent the Lender from having to avail itself of any rights and remedies, since the Borrowers and Guarantors are responsible for any expenses incurred by the Lender in connection with the collection of those sums due under the Loans, including without limitation, the Lender's legal fees. In the event that, on or before April 30, 2010, (a) the Lender has not received (a) the Final Payoff for each Loan plus per diem interest for each Loan through the date of payment, (b) cash collateral in an amount equal to the aggregate face amount of all of the outstanding Letters of Credit (to the extent such Letters of Credit are not otherwise terminated or extinguished prior to such date), and (c) additional cash collateral in the amount of $784,268 to secure the Obligations under the Swap Contracts, the Lender shall have no option but to avail itself of its rights and remedies under the Agreement and the other Loan Documents.

TROUTMAN
SANDERS

April 21, 2010
Page 3

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:   J. Kent Thompson (by email)
      Shawn Weingast (Fedex overnight)

# TROUTMAN
# SANDERS

April 21, 2010
Page 4

## ADDRESSES:

Gunston Hall Realty, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Industries, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Medical International, Inc., a Delaware
corporation
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Medical Engineering, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

CNMC Co., Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Theratronics, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Arplay USA, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Medical International, Inc., a Virginia
corporation
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Huestis Machine Corporation
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Brachytherapy Services, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Medical Research, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Best Vascular, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

One Best Drive, L.P.,
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Krishnan Suthanthiran
7643 Fullerton Road
Springfield, Virginia 22153

*Best*® *medical international*

May 6, 2010

J. Kent Thompson
Senior Vice President
Wachovia Bank, N.A.
1753 Pinnacle Drive, 3rd Floor - VA 1936
McLean, VA 22102

Dear Kent:

Based on your comments during our recent meeting, I understand that your proposals with respect to terms of an extension agreement for the Best Medical and Huestis loans are subject to the approval of your boss. The purpose of this letter is twofold: first, to set forth what we see as our significant and sincere offer to reduce Wachovia's total exposure as rapidly as possible without endangering the viability of Best Medical and our related companies; and second, to request the opportunity to meet with the individual who has authority to approve an extension agreement.

As a 30+ year customer of Wachovia, with the collateral and debt amortization schedule summarized below, and because of the critical importance of an agreement at this time, we feel compelled to leave no stone unturned with respect to a solution that works for Wachovia and Best Medical.

Additional principal payments of $250K/month begun in April and an additional amount of $475K by June 15 will result in a minimum of $2,725K reduction in principal outstanding by December 31. Approximately $480K in principal will be paid on the Best Medical Line of Credit secured by the Fullerton Road property, for a total of about $3.2 million in amortization from operating cash flow including the effect of potential R&D expense reductions you asked about.

In terms of existing collateral securing approximately $12.5 million in loan outstanding are the business assets of BMI and Huestis, primarily accounts receivable of $4 million, inventory of $9 million and PP&E of $2.5 million, plus the Fullerton Road property appraised for Wachovia in May 2009 for $3.9 million, plus three properties totaling over $10 million based on recent appraisals. Counting only accounts receivable and the appraised properties, there is approximately $18 million in collateral value securing Wachovia's loans.

In conjunction with the principal reductions noted above, we continue to aggressively seek refinancing of any or all Wachovia debt from bank and non-bank sources. This effort will continue and can be documented for you. It is our goal to pay off Wachovia as soon as possible and we offer proven cash flow which can amortize the total debt at a rate of at least $3.2 million per year, plus a significantly increasing collateral coverage margin over time.

Best Medical and its related companies have made every payment of principal and interest as agreed over a long period of time and we will be doing the same with the additional principal payments described above. We hope this can be considered, together with Wachovia's collateral, as essentially sufficient for an extension of our credit facilities.

Yours truly,

Shawn Weingast
General Counsel

7643 Fullerton Road, Springfield, VA 22153 USA
phone 703 451 2378   800 336 4970   fax 703 451 5228
www.bestmedical.com

AFRICA   ASIA   EUROPE   LATIN AMERICA   MIDDLE EAST   NORTH AMERICA

*Best*

*healthcare for everyone*

# Best medical international

June 24, 2010

Mr. J. Kent Thompson
Senior Vice President
Wells Fargo
1753 Pinnacle Drive, 3rd floor
McLean, VA 22102

Dear Kent:

This is a follow up to my e-mail dated March 30, 2010, a copy of which is enclosed for your reference. Beginning in April, we have been paying down $250,000 a month towards our loan principal. We plan to make our next payment on July 1st, next week. Our goal is to continue to do so and work with other banks to transition all of our business from Wachovia to another bank, as you have been forcing us to do. During the past three years, we paid about $3 million in interest and an equal amount in principal. Just during the last three months, we paid $750,000.

For 35 years your bank aggressively sought our business and wanted to lend us money. Your staff has been encouraged to lend money. For instance, four years ago our building in Springfield, Virginia was appraised at $3.5 million. Your bank provided us a $5 million loan with my personal guarantee. Today this same building is worth more than $5 million and has a triple net income of $525,000; our loan amount on this property is approximately $4 million. You have been forcing us to repay this loan.

You gave us a 10-year term loan on our Huestis and ARI companies in Rhode Island. Every payment of principal and interest has been paid on this loan. In spite of this, you increased our interest and are forcing us to repay this loan in full and charging us a prepayment penalty.

I have had a banking relationship with Wachovia and its predecessors since 1973. During this period of 37 years, your bank has never lost a penny in your dealings with us. In spite of this, you continue to harass us. I have more than $100 million in personal net worth, and you received a personal guarantee and substantial portions of my assets as collateral for a loan of approximately $12 million. We continue to pay down this loan by approximately $250,000 per month for principal and additional sums for interest. Your actions constitute blackmail, harassment and racial discrimination. You have been engaging in discrediting my reputation and that of my companies. This can only be interpreted as racial discrimination. Your continued harassment will force us into nonexistence. We will proactively challenge your harassment, blackmail and racial discrimination.

With kind regards,

Krishnan Suthanthiran
President

cc:     John G. Saumpf
        Tim Butturini
        Robert King Steel
        Kenya Crenshaw
        Ruth Bergin
        Shawn Weingast

7643 Fullerton Road, Springfield, VA 22153 USA
phone 703 451 2378   800 336 4970   fax 703 451 5228
        www.bestmedical.com

AFRICA     ASIA  |  EUROPE  |  LATIN AMERICA  |  MIDDLE EAST  |  NORTH AMERICA

