UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



BEST MEDICAL INTERNATIONAL
INDUSTRIES INC., a Virginia Corporation;
HUESTIS MACHINE CORP., a Rhode Island
Corporation, GUNSTON HALL REALTY, a
Virginia Corporation; BEST INDUSTRIES INC.,
a Virginia Corporation and KRISHNAN
SUTHANTHIRAN, an individual,

      Plaintiffs,

v

WELLS FARGO, NA, as successor in interest
to WACHOVIA BANK, N.A and
J. KENT THOMPSON, an individual,

      Defendants.

CASE NO. 1:10cv988

Hon. Liam O'Grady

_____\

## FIRST AMENDED COMPLAINT

Now comes the plaintiffs, by and through their attorney, and hereby files this First

Amended complaint as of right pursuant to FRCP 15(a) against the defendants as follows:

## JURISDICTION AND PARTIES

1.    Plaintiff Best Medial International Industries, Inc. is a Virginia corporation doing

business on a regular and systematic basis in Fairfax County, Virginia. Best Medical

International, Inc. entered into a series of contracts with the defendant Wells Fargo, NA as

successor to Wachovia Bank, NA to borrow and/or guarantee certain loans and lines of credit the

last of which occurred  on or about July 31, 2009.

2.    Plaintiff  Huestis Machine Corporation, is a Rhode Island Corporation. Huestis

Machine Corporation also entered into a series of contracts with the defendant Wells Fargo, NA as successor to Wachovia Bank, NA to borrow and/or guarantee certain term loans and/or lines of credit the last of which occurred on or about July 31, 2009.

3.      Plaintiff Gunston Hall Realty, Inc. is a Virginia Corporation doing business on a regular and systematic basis in Fairfax County, Virginia. Gunston Hall Realty, Inc. entered into a a series contracts with the defendant Wells Fargo, NA as successor to Wachovia Bank, NA to borrow and/or guarantee certain loans and/or lines of credit the last of which occurred  on or about July 31, 2009.

4.      Best Industries, Inc. Is a Virginia Corporation, doing business on a regular and systematic basis in Fairfax County, Virginia. Best Industries, Inc.. entered into a contract with the defendant Wells Fargo, NA as successor to Wachovia Bank, NA to borrow and /or guarantee certain loans and/or lines of credit the last of which occurred on or about July 31, 2009.

5.      Krishnan Suthanthiran is an individual who is sole owner, sole shareholder, president  and  CEO for plaintiffs Best Medical International, Huestis Machine Corporation, Gunston Hall  Realty, Inc. and Best Industries, Inc. and who does business on a regular and systematic basis in  Fairfax Country Virginia and is also individual of Indian descent and therefore a member of a  protected class of persons as defined by Virginia statute commonly referred to as the Virginia  Equal Credit protection Act; Va Code 59.1-21.21:1  as described below.

6.      Defendant, Wells Fargo Bank, National Association is a foreign Corporation that does business on a systematic and regular basis in Fairfax County, Virginia and on or about December 31, 2008 purchased and became a  successor in interest to Wachovia Corporation. The individual defendant, J Kent Thompson is employed by the defendant Wells Fargo as a  Vice

President and to the best of plaintiffs' information and belief resides in Fairfax County or Prince William County Virginia and does business in Fairfax County, Virginia

7.     That on or about July 31, 2009 Wells Fargo Bank, NA, assumed obligations as the 'Lender' pursuant to a Waiver and Amendment Agreement between Wachovia Corporation and the plaintiffs. Said loan agreement pertained to loans and/or lines of credit to the plaintiff in sums totaling $15,000,000.00 in the aggregate. .

8.     That the transactions and/or occurrences related to this cause of action occurred in Fairfax County, and venue is proper in Fairfax, County, Virginia pursuant to Va Code Ann 8.01-26 2 (4).

9.     That jurisdiction and venue relative to this matter is therefore proper in Fairfax County Circuit Court, Commonwealth of Virginia

## FACTUAL ALLEGATIONS

10.     Plaintiff hereby incorporates by reference preceding paragraphs 1-9.

11.     The parties have a long standing banking relationship that included the provision of term loans, letters of credit and guarantees for repayment..

12.     Prior to Wells Fargo Bank, N.A. purchase of Wachovia Corporation the relationship was productive and profitable for all parties. This included regular renewals of debt and lines of credit available to the plaintiff's based on their excellent repayment record and sound business practices. In fact, defendant affirmatively solicited the plaintiffs business relative to loans because of the plaintiff's excellent repayment history and record of business growth, acumen and profitability.  Specifically, plaintiffs had the following term loans and credit lines as of January, 2009:

A.     Promissory Note between Best Medical International, Inc. and Wachovia Bank for  $3,000,000.00 dated October 29th, 2004, (Exhibit 1).

B.   Promissory Note between Gunston Hall Realty, Inc. and Wachovia Bank for $5,000,000. dated August 5, 2005, (Exhibit 2).

C.   Term note between Huestis Machine Corporation and Wachovia bank for $5,000,000.00 dated December 1, 2006 to 2016, (Exhibit 3).

D.   Supplemental Term Note between Huestis Machine Corporation and Wachovia Bank for $2,000,000.00 dated December 1, 2006 to February 28, 2017, (Exhibit 4).

13.   The above transactions resulted in loans amounting to $15,000,000.00 between the parties.

14.   The parties also entered into interest rate swap agreements relative to the Huestis Machine Corporation term loans.

15.   In addition, the parties  entered into guarantee agreements in which collateral from the corporate plaintiffs as well as the individual plaintiff, Krishnan Suthanthiran provided security for the loans, (Exhibit 5).

16.   In 2009, soon after defendant Wells Fargo purchased Wachovia, the relationship between the  parties deteriorated significantly despite the fact that all payments on the loan agreements were paid timely or early.

17.   Specifically, defendant Wells Fargo Bank, NA refused to agree to renewals or extensions of the debt, demanded increased interest percentage rates, unreasonably demanded immediate pay off of the loans at their maturity, demanded greater collateral and pre-payment penalties, made unreasonable demands for immediate information regarding security without allowing a reasonable amount of time to acquire the information and made unrealistic demands for the time allowed to obtain requested financial information or signing closing documents. In addition, the defendant bank required onerous provisions heretofore not required such as a

confessed judgment clause and certain releases of claims and waivers of rights such as the right to a jury trial relative to disputes.

18.     On July 31, 2009, plaintiff(s) were compelled to agree to the aforementioned onerous terms in a 'Waiver and Amendment Agreement" dated July 31, 2009. The plaintiff had already borrowed the funds subsequent to the solicitation of Wachovia Bank. The plaintiffs continued making all payments on a timely basis.  The parties prior practice of  routinely agreeing to yearly renewals was profitable and/or beneficial to all parties and the borrowed funds continued to be invested in the operations and expansion of the plaintiff's business interests, (Exhibit 6).

19.     The defendants knew the purposes for which the plaintiff(s) procured the loans was to expand and finance their businesses including hiring employees.

20.     When the onerous Waiver and Amendment Agreement expired in January, 2010 the defendant refused to renew the loan instead making unreasonable demands relative to the plaintiff's research and development expenditure and inventory value to the degree that Wachovia Bank virtually attempted to take day to day control of the plaintiffs' business ventures.

21.     In April, 2010 the plaintiffs offered, and in fact paid an additional $250,000.00 per month toward the principal on the loans as a demonstration of their good faith and obvious credit worthiness. This amount was far in excess of what payments were required under the loan contract provisions.

22.     It was clear from plaintiff Krishnan Suthanthiran that these additional payments were made contingent upon the bank agreeing to extend the loan another six months into November, 2010. Plaintiff has made additional payment of well over $1,000,000.00 on the notes since that time. The defendant cashed the contingent payments but still refuse to extend the

loans.

23.    On April 21, 2010 plaintiffs received a correspondence from defendant bank attorneys requiring accelerated payments on all the loans including the Heustis Machine Company term loans which were not due until 2016 and 2017 respectively.

24.    On May 6, 2010 plaintiffs contacted the defendant J. Kent Thompson reiterating its good faith efforts to pay significant sums toward retirement of the debt while attempting to renegotiate an extension. Plaintiffs further requested a meeting with the individual responsible for making the decision relative to the loan extension however the plaintiff's good faith efforts were ignored by defendant Thompson, (Exhibit 7).

25.    Defendant in fact continued to unreasonably deny plaintiffs' efforts to extend the loans despite Plaintiff's stellar repayment history over six years and past practices of routinely granting extensions and renewals.

26.    On June 24, 2010 Plaintiff Krishnan Suthanthiran contacted defendant bank's senior Vice President, defendant J. Kent Thompson and informed him that he believed the banks actions was the result of racial (and/or national origin) discrimination. The defendant bank did no meaningful investigation of the plaintiff Suthanthiran's complaint, (Exhibit 8).

27.    Defendant, each and all of them, then retaliated against plaintiff for making his civil rights complaint by filing confessed judgments against the plaintiffs on June 30, 2010 despite plaintiffs excellent past record of payments to the defendant bank.

## COUNT I

### VIOLATION OF THE VIRGINIA
### EQUAL CREDIT OPPORTUNITY ACT
### AS TO DEFENDANT WELLS FARGO BANK, N.A.

28.    Plaintiff hereby incorporates by reference all prior paragraphs 1-26

29.    The credit transactions and request for extension as described above is subject to

the Virginia Equal Credit Opportunity Act , Va Code 59.1-21.21:1 which states:

> It shall be unlawful for any creditor to discriminate against any
> applicant, with respect to any aspect of a credit transaction
>
> (1) On the basis of race, color religion, national origin, sex or marital status of

age.

30.    The defendant bank has an established history of discriminating against minority

customers. For example, the State of Illinois' Attorney General has sued Wells Fargo, NA

because their subpoenaed information has shown that minority borrowers received less favorable

terms than white borrowers. Also, and that Wells Fargo disproportionally steered minority

borrowers into high cost loans, See Illinois v Wells Fargo N.A., Cook County Circuit Court,

Case No. 09 CH 26434 filed on July 31, 2009.

Also, in the lawsuit of Baltimore v Wells Fargo, NA the plaintiffs data demonstrates that

Wells Fargo targeted minorities in Baltimore and the Washington D.C. area with higher cost

loans and employee whistleblowers have testified that Wells Fargo personnel verbalized racial

slurs and innuendo relative to these loans, See Mayor and City of Baltimore v Wells Fargo, NA,

United States District Court, District of Maryland, Baltimore Division, Case No. 1:08 cv 00062-

JFM. Similar lawsuits suits against the defendant have been filed throughout the country and the

NAACP has recently settled a similar matter with Wells Fargo. The data provided in these cases

demonstrate a corporate mentality and culture willing to intentionally discriminate by abiding to

lending policies that have a discriminatory impact upon minority borrowers or treat minority

borrowers in a disproportionately adverse manner than non minority customers.

31.    Defendant intentionally discriminated against the plaintiffs on

the basis of race and/or national origin in the following particulars:

a.   Refusing to grant, or even negotiate renewals or extensions of loans and/or lines of credit to businesses with minority owners including plaintiff.

b.   Requiring minority business owners, including plaintiff to agree to onerous and unfair conditions as expressed in the Waiver and Amendment Agreement. These include requiring a Confession of Judgment provision, demanding greater collateral, doubling the interest rate and demanding waivers of basic rights under law such as a jury trial to resolve disputes despite the fact that these demands were typically not made in prior years. These demand were made despite the fact plaintiff was making all payments on time.

c.   That the defendant implemented policies, goals, objectives and directives that were disproportionally hostile to racial and national origin minorities. This essentially resulted in treating minority borrowers unfairly as compared to non minority borrowers. This conclusion is evidenced by data discovered in lawsuits filed in other venues involving defendant as a party which have been discussed in paragraph 29 above.

d.   That the defendant implemented policies, goals, objectives and directives that were disproportionly hostile to geographical areas that had concentrations of racial and national origin minorities. These policies, goals, objectives and directives resulted in a negative or adverse impact civil rights guaranteed by the Constitution and laws of the Commonwealth of Virginia.

e.   By retaliating against the plaintiff, Mr. Suthanthiran for making a Civil Rights complaint by unreasonably filing a confessed judgment days after the civil rights issue was raised with the defendant. To the best of plaintiff's information and belief this was decided by defendant Thompson who was accused by plaintiff Suthanthiran of civil rights violations.

f.   That any reasons stated by the defendants for refusing to fairly negotiate loan terms and/or agree to loan or line of credit extensions are pretextual and designed to hide or cover up it's adverse outcome or impact upon minorities who make loan applications.

g.   Plaintiffs have received two term sheets from credit facilities relative to refinancing the loans in question thereby indicting that defendants conduct was not related to the plaintiffs credit worthiness.

32.   Such conduct has denied and will continue to deny Plaintiff equal protection and the right to be free from discrimination as expressed in Virginia law and Constitution.

33.     Defendants conduct was willful, malicious, and intentional as such terms are defined by law.

34.     As a direct and proximate result of Defendants unlawful business practices and tortious acts as described above, Plaintiff has suffered damage to their reputations lost and will continue to lose substantial income including, but not limited to, business opportunity in the present, past and future.

35.     As a further direct and proximate result of Defendants unlawful business and lending practices, Plaintiff Krishnan Suthanthiran has suffered the indignity of discrimination, severe humiliation, injury to his person and feelings, loss of standing and status in the community, irreparable harm to his reputation, and invasion of his right to be free from discrimination and retaliation.

WHEREFORE, plaintiffs seek judgment against the defendant in the amount of $1,000,000.00 in addition to costs, attorney fees and punitive damages as allowed by statute or such other amount as may be just.

### COUNT II

### VIOLATION OF THE VIRGINIA
### EQUAL CREDIT OPPORTUNITY ACT
### AS TO DEFENDANT J. KENT THOMPSION

36.     Plaintiff hereby incorporates by reference preceding paragraphs 1-35.

37.     Defendant J. Kent Thompson is a Vice President of defendant bank.

38.     Defendant Thompson was assigned by the bank to work with plaintiffs relative to their loans with Wachovia/Wells Fargo.

39.     The Virginia Equal Credit Protection Act (heretofore known as the Act) is designed to prevent race and /or national origin discrimination from occurring in the applying for

or the provision of credit in the Commonwealth of Virginia.

40.     The Act defines a 'creditor' as **any person** who regularly extends, renews, or continues credit; **any person** who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit, See Va Code 59.1-21.2(c).

41.     The Act further defines the term person to mean **a natural person**, a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association, See Va Code 59.1-21.20(d).

42.     The Act unambiguously and affirmatively allows for the individual liability of a natural person involved in the acceptance or denial of an application for credit or credit extension.

43.     Mr. J. Kent Thompson is such a natural person who regularly arranges for the extension, renewal or continuation of credit and/or participates in the decision to extend, renew or continue credit.

44.     The credit transactions and request for extension as described above is subject to The Virginia Equal Credit Opportunity Act , Va Code 59.1-21.21:1 which states:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction
>
> (1) On the basis of **race**, color religion, **national origin**, sex or marital status of age.

45.     Defendant intentionally discriminated against the plaintiffs on the basis of race and/or national origin in the following particulars:

> a.     That Mr. Thompson demonstrated animosity while negotiating with Mr. Suthanthiran  by communicating in a loud, rude, offensive manner whereas his communications and negotiations with non minority persons

were respectful and business like. Such behavior is an ultra vires act not necessarily within the scope of employment with Wells Fargo bank.

b.   That Mr. Thompson refused to grant, or even negotiate yearly renewals or extensions of loans and/or lines of credit to businesses with minority owners including plaintiff whereas plaintiffs believe that such credit was negotiated and/or granted to non minority applicants and customers.

c.   That Mr. Thompson required minority business owners, specifically plaintiff, to agree to onerous and unfair conditions as expressed in the Waiver and Amendment  Agreement. These include requiring a Confession of Judgment provision, demanding greater collateral, doubling the interest rate and demanding waivers of basic rights under law such as a jury trial to resolve disputes despite the fact that these demands were typically not made in prior years. These demand were made despite the fact plaintiff was making all payments  on time.

d.   That Mr. Thompson retaliating against the plaintiff, Mr. Suthanthiran for making a Civil Rights complaint by unreasonably filing a confessed judgment days after the civil rights issue was raised with the defendant. To the best of plaintiff's information and belief this was decided by defendant Thompson who was accused by plaintiff Suthanthiran of civil rights violations.

e.   That Mr. Thompson required and/or encouraged employees to implement policies that were disproportionally adverse to racial and national minority business owners as compared to non minority business owners who were credit applicants.

f.   That any reasons stated by the defendants for refusing to fairly negotiate loan terms and/or agree to loan or line of credit extensions are pretextual and designed to hide or cover up it's adverse outcome or impact upon minorities who make loan applications.

g.   Plaintiffs have received two term sheets from credit facilities relative to refinancing the loans in question thereby indicting that defendants conduct was not related to the plaintiffs credit worthiness.

46.   Such conduct has denied and will continue to deny Plaintiff equal protection and the right to be free from discrimination as expressed in Virginia law and Constitution.

47.   Defendants conduct was willful, malicious, and intentional as such terms are defined by law.

48.     As a direct and proximate result of Defendants unlawful business practices and tortious acts as described above, Plaintiff has suffered damage to their reputations lost and will continue to lose substantial income including, but not limited to, business opportunity in the present, past and future.

49.     As a further direct and proximate result of Defendants unlawful business and lending practices, Plaintiff Krishnan Suthanthiran has suffered the indignity of discrimination, severe humiliation, injury to his person and feelings, loss of standing and status in the community, irreparable harm to his reputation, and invasion of his right to be free from discrimination and retaliation.

WHEREFORE, plaintiffs seek judgment against the defendant in the amount of $1,000,000.00 in addition to costs, attorney fees and punitive damages as allowed by statute or such other amount as may be just.

## COUNT III

### FRAUD AND/OR CONSTRUCTIVE FRAUD
### AS TO ALL DEFENDANTS

50.     Plaintiff hereby incorporates by reference prior paragraphs 1-48.

51.     The parties had enjoyed a mutually successful business relationship for over thirty years that included a variety of loan and line of credit instruments. In 2007 and early 2008, Wachovia representatives, Todd W. Rowley, Senior Vice President, Commercial Division in McLean, VA and Anne Sheahan, Vice President, Commercial Risk Manager of Philadelphia, PA, meet with plaintiff Krishnan Suthanthiran and other team members at Best and offered to provide a $20 million line of credit and extend it beyond the terms we had.  They even offered to

make this a multi-year loan that we could use for acquisition and operating capital. This was supposed to replace the $3 million line of credit we had with the bank at that time. They also charged us a review fee of approximately $25,000. However, these individuals failed to inform us that Wachovia was in serious financial trouble and theer was a distinct possibility of bankruptcy. They withheld this critical information from us in our decision making. If it were not for this, we would have pursued a relationship with other banks when the financial markets were eager to lend money to businesses such as the plaintiffs.

52.     In December 2007 and January 2008 Wachovia offered to finance a building plaintiffs were purchasing and provide a loan of $6 million with a first mortgage on this property as a 5 or 10 year term loan. As a result of this, plaintiffs withdrew an application and rejected an offer from National City Bank of Pittsburgh for a $6 million loan. During this time, again, Wachovia failed to tell plaintiff that the bank was in serious financial trouble and that there was a distinct possibility of bankruptcy. If it were not for Wachovia's offer, plaintiffs would have obtained a $6 million loan from National City and they would have given us funds for acquisition. Instead, plaintiffs used their cash reserve to purchase this property.

53.     Prior to Defendant Mr. Thompson taking over as Wachovia's representative the credit facilities were always extended and payments were always made timely or early.

54.     The knowledge of said history is imputed upon all the defendants as successor in interest to Wachovia. In addition, the defendant received approximately 25 billion dollars from the federal government TARP funds. On February 26, 2010 Mr. David Hoyt, Wells Fargo Head of Wholesale Banking testified before the House Financial Services Committee and the House Small Business Committee and represented that the company is 'making credit available to credit worthy borrowers'. The plaintiffs, as creditworthy customers with an excellent repayment record,

had a reasonable expectation that credit renewals would continue to be reasonably provided to them. In fact, these loans were extended or renewed as promised until 2009. These words and actions amount to a representation that defendant would continue to renew the notes as long as payments were timely made.

55.    Plaintiffs reasonably relied upon this representation and expectation by continuing to borrow from the bank and using the funds to operate and expand their businesses. In addition, the plaintiff's refrained from borrowing funds from other banks or financial institutions based upon plaintiff's reasonable belief that the loans would be renewed if payments were timely made.

56    This reasonable reliance upon the defendant's representations and actions were detrimental to the plaintiffs' interest in the following particulars:

      a.    That on July 31, 2009 plaintiffs were essentially forced by all defendants to accept the unconscionable terms and conditions included in the Waiver and Amendment Agreement which are described above in order to continue their business operations

      b.    On or about June 30, 2010 the defendants filed confessed judgments against the plaintiffs after their refusal to extend or renew the loans. As a result, plaintiffs' ability to obtain financing is impaired which has created an extreme hardship for plaintiff's business operations as well as their respective employees. It also depicts plaintiff in a false light so as to make it appear that plaintiff is unable to make the loan payments when in fact all regularly scheduled payments had been timely made. This in turn has damaged the business and personal reputation of the plaintiffs.

57.    The defendants refusal to continue reasonable loan extensions under the circumstances as described above constitutes a misrepresentation and/or   constructive misrepresentation of material fact.

58.    The plaintiff, each and very one of them, suffered damages when they relied upon the defendants' misrepresentations to their detriment. This factual scenario is a classic bait and switch maneuver by the defendant bank. Defendant induced the plaintiff's into

accepting or guaranteeing loans that defendant solicited. The inducement included the representation that the one year loans would be extended as long as the payments were timely made.   The plaintiff's accepted the loans and used the funds to expand their business while the bank routinely renewed the yearly notes. Plaintiff's continued to make their payments in a timely manner. In 2009 defendant bank abruptly stopped renewing the loans.  Despite the plaintiffs stellar payment record the bank forced plaintiff into an onerous amended agreement that contains increased collateral requirements and waivers of basic legal rights in order to extend the loan. When the onerous amended agreement expires the bank again refuses to extend the note even after plaintiff continued to make monthly payments far in excess of the payments required under the contract. The bank then attempts to enforce foreclosure on the loan collateral though the onerous confessed judgment provision forced upon the plaintiff in the amended agreement. Defendant abruptly changed the rules of a 37 year relationship  forcing a  thriving, ongoing businesses that always paid their bills on time into a foreclosure action. The bank can now foreclose on a performing loan earning all of its money immediately while the plaintiffs must forfeit its businesses and property resulting in loss of business opportunities, profits and putting over 400 local jobs at serious risk.

59.    As a direct and proximate cause of the defendants fraud and/or constructive fraud plaintiff's  have now suffered damages to their reputation, credit rating, the cost of future financing, personal anguish and distress on the part of the individual plaintiff and the loss of business opportunity and profits destroyed by the lack of capital financing caused and created by the defendant's wrongdoing.

WHEREFORE, plaintiffs seek declaratory judgment rescinding the agreement of July 31, 2009 thereby preventing defendants from enforcing the agreement as well as money

damages for economic and non-economic losses caused by the defendants' wrongdoing that plaintiffs believe are in excess of $1,000,000.00

## COUNT IV

## EQUITABLE ESTOPPEL
## AS TO ALL DEFENDANTS

60.    Plaintiff hereby incorporates by reference prior paragraphs 1-59.

61.    The defendants represented through words and actions as described above to the plaintiffs the reasonable belief that loans and credit lines would be renewed each year upon their expiration if the payments were timely made. Defendant also solicited further loans from the plaintiff throughout their long term relationship of over 30 years.

62     Plaintiff relied on this representation by continuing to make loans and invest the funds in their business.

63.    After the Wells Fargo takeover of Wachovia bank in December, 2008 the defendant ceased renewing the debt under the direction of defendant J. Kent Thompson  and instead required the plaintiff to enter into a into a Waiver and Amendment Agreement on July 31, 2010 which included drastically increased interest rates, increased collateral requirements and a confessed judgment provision which in the past were typically omitted. In addition, the $7,000,000.00 ten year term notes that remained performing loans were also subject to being called early.

64.    Defendant's requirement that plaintiff enter into the July 31, 2009 agreement was contrary to the defendant's  representations and plaintiffs reasonable expectation of yearly loan renewals.

65. Plaintiff had no choice but to enter into the Waiver and Amendment Agreement of July 31, 2009 because plaintiff had already borrowed the funds for its business operation and expansion. Plaintiffs therefore were compelled to enter the agreement under economic duress. But for the defendants refusal to continue to extend or renew the loans as promised the plaintiffs would never have agreed to the terms of the July 31, 2009 agreement. Instead, after years of timely payments and loan extensions, the bank changed the rules and forced plaintiffs into foreclosure.

66. In April, 2010 plaintiff began making $250,000.00 principal payments on the 10 year term notes stating that the payments were contingent upon the defendant extending the notes at least for six months to November, 2010.

67. Defendants cashed the checks yet continue to refuse the extensions.

68. On or about June 30, 2010 the defendants filed a confessed judgment against the plaintiff after it refused to renew the notes.

69. The defendant should be equitably restrained from asserting its rights to enter or foreclose on the judgment because the plaintiff borrowed the funds with the reasonable expectation that loans would be automatically renewed if the payments were made on time.

70. The defendant should be equitably restrained from asserting it's rights to enter or foreclose on a judgment because plaintiff is making $250,000.00 per month payments (as opposed to payments of about $37,000) contingent upon defendant extending the notes at least six months to November, 2010. The defendant cashed the checks but continues to refuse to extend the loans.

71. The defendant has unclean hands in this matter due to it's failure to extent the loans, it's refusal to extend the loans after accepting the $250,000.00 contingent payments and

it's failure to disclose the banks precarious financial situation while soliciting plaintiffs to refuse loans from other lending institutions and borrow additional money from them.

72.    Plaintiff made all scheduled payments in a timely manner prior to expiration of the note.

73.    Plaintiff refrained from seeking alternative financing when the defendant solicited further loans in reliance upon the past practice of renewing the debt.

74.    Defendant would be unjustly enriched if allowed to prosper by its bad faith and unfair dealings with the plaintiff.

75.    As a direct and proximate cause of the defendant's wrongdoing as described above the plaintiff suffered damages to their reputation, credit rating, personal anguish and mental distress and loss of business opportunity.

WHEREFORE, plaintiffs seek declaratory judgment rescinding the agreement of July 31, 2009 thereby preventing defendants from enforcing the agreement of July 31, 2009 as well as money damages for economic and non-economic losses caused by the defendants' wrongdoing that plaintiffs believe are in excess of $1,000,000.00

## COUNT V

## ECONOMIC DURESS

76.    Plaintiff hereby incorporates by reference prior paragraphs 1- 75.

77.    Virginia law defines economic duress as when a person is compelled to assent to an agreement by means of wrongful acts or threats that overcome that persons free will, (See *Bond v Crawford, 193 Va 437; 69 SE2nd 470 (1952); Laymon v Kroger Co., 924 F2d 1052 (4th Cir 1991).*

78.     The plaintiff's relied upon the representations that the loans would be extended as long as the payments were timely made.

79.     Plaintiff continued to make timely payments as required by the loan contracts.

80.     In 2009 the defendant abruptly ceased making the extensions available despite plaintiff making all payments on a timely basis.

81.     In order to prevent foreclosure of its assets and continue its business operations the plaintiffs had to capitulate to the defendants demands and agree to the July 31, 2009 Waiver and Amendment Agreement. This agreement included the onerous confession of judgment provision that heretofore had been stricken from prior agreements as well as waiver of basic rights to a jury trial, release of all claims against the bank and significant interest rate increase.

82.     As a direct and proximate cause of the defendant's wrongdoing as described above the plaintiff suffered damages to their reputation, credit rating, personal anguish and mental distress and loss of business opportunity.

WHEREFORE, plaintiffs seek judgment against the defendant of $1,000,000.00 or such other amount as may be just and further request that the July 31, 2009 agreement be rescinded thereby preventing the defendants from foreclosing on plaintiffs assets.

## COUNT VI

## BREACH OF FIDUCIARY DUTY AS TO ALL DEFENDANTS

83.     Plaintiff hereby incorporates by reference prior paragraphs 1- 82.

84.     The defendants, each and all of them had a fiduciary duty toward the plaintiffs in light of their sale of interest rate swap agreement s that were confirmed on December 8, 2006 and February 23, 2007 respectively.

85.     That at the time of at least one of these agreements Wachovia bank was on the

cusp of financial collapse to the degree that the bank was about to become insolvent and placed
into receivership, be bailed out by the government, purchased by another bank or all of the
above.

86.     That no representative of Wachovia ever informed any of the plaintiffs or their
agents of the bank's financially precarious position.

87.     In spite of the bank's precarious financial position they sold a interest rate swap
derivative supposedly as a hedge to protect the plaintiff from future rising interest rates. In
addition, defendant solicited the plaintiffs to forego loans from other lending institutions and
borrow additional funds from Wachovia.

88.     The bank took on the role of financial adviser once they marketed and sold the
swap agreement to plaintiffs.

89.     As a result, each of the defendants assumed a fiduciary duty to the plaintiffs
which required them to act in the plaintiff's best interests.

90.     Instead, the defendants sold plaintiffs a complicated interest rate derivative
product that resulted in a substantial profit to the defendants at the plaintiff's expense.

91.     That the plaintiffs were reasonably unaware that these swap agreements were for
the benefit of the bank until on or about September 20, 2010.

92.     Defendants further breached their fiduciary duties to the plaintiff in the following
particulars:

   a.   Unreasonably refused to grant, or even negotiate renewals or extensions of
        loans and/or lines of credit to plaintiffs despite their creditworthiness,
        history of timely or early payments and consistent past practice of
        renewing the loans upon maturity.

   b.   Requiring plaintiffs to pay off the Heustis 10 year term note immediately
        despite timey an early payments.

c.   Unreasonably requiring the plaintiffs to enter into the onerous Waiver and Amendment Agreement which included increased interest rates, increased security, bank control over many business operations, waiver of basic rights, releases of claims the addition of confessed judgment provisions and unconscionable prepayment penalties and attorney fee allowances.

93.   That the aforementioned breaches of fiduciary duty resulted in windfall profit, or the potential for windfall profit, to the defendant bank at the expense of the plaintiffs resulting in a conflict of interest.

94.   That as a direct and proximate cause of the defendants breach of fiduciary duty the plaintiff suffered economic and non economic damages to their reputation, credit rating, personal anguish and mental distress and loss of business opportunity.

WHEREFORE, plaintiffs seek judgment against the defendant of $1,000,000.00 or such other amount as may be just and further request that the July 31, 2009 agreement be rescinded thereby preventing the defendants from foreclosing on plaintiffs assets.

## COUNT VII

## NEGLIGENCE AS TO ALL DEFENDANTS

95.   Plaintiff hereby incorporates by reference prior paragraphs 1- 94.

96.   Defendants, as financial advisors to plaintiffs, had a duty to act reasonably relative to all their interactions with the plaintiffs.

97.   The defendants, each and all of them, breached this duty in the following particulars:

a.   Unreasonably refused to grant, or even negotiate renewals or extensions of loans and/or lines of credit to plaintiffs despite their creditworthiness, history of timely or early payments and consistent past practice of renewing the loans upon maturity.

b.   Requiring plaintiffs to pay off the Heustis 10 year term note immediately despite timey an early payments.

c.     Unreasonably requiring the plaintiffs to enter into the onerous Waiver and Amendment Agreement which included increased interest rates, increased security, bank control over many business operations, waiver of basic rights, releases of claims the addition of confessed judgment provisions and unconscionable prepayment penalties and attorney fee allowances.

d.     Selling swap agreements without disclosing the windfall profit the defendants received on the very first day of the effective date of the agreement.

e.     Selling the swap agreements without advising the plaintiffs of their fragile financial situation. The defendants forced the plaintiffs to agree to the onerous Waiver and Amendment Agreement of July 31, 2009 so they would be in a position of rapidly foreclosing on the loans so as to quickly improve their own financial position at the expense of their own clients.

98.     That as a direct and proximate cause of the defendants breach of fiduciary duty the plaintiff suffered economic and non economic damages to their reputation, credit rating, personal anguish and mental distress and loss of business opportunity.

WHEREFORE, plaintiffs seek judgment against the defendant of $1,000,000.00 or such other amount as may be just and further request that the July 31, 2009 agreement be rescinded thereby preventing the defendants from foreclosing on plaintiffs assets.

## RELIEF SOUGHT

WHEREFORE, Plaintiff demands judgment of $1,000,000.00 in whatever amount he is found entitled to, plus costs, interests, and fees, including reasonable attorney fees, witness fees and punitive damages as allowed by statute.

**TRIAL BY JURY IS DEMANDED.**

**BEST MEDICAL INTERNATIONAL**
**INDUSTRIES INC.,**
**HUESTIS MACHINE CORP,**
**GUNSTON HALL REALTY,**
**BEST INDUSTRIES INC**
**KRISHNAN SUTHANTHIRAN**
By Counsel

Shawn R. Weingast, Esq.
Virginia State Bar No. 33259
Attorney for the Plaintiffs
7643 Fullerton Road
Springfield, VA 22153
Tel: (703) 451-2378
sweingast@teambest.com

James M. Brady
Pro Hac Vice
Attorney for the Plaintiffs
7643 Fullerton Rd.
Springfield VA 22153
703 451 2378/fax  5228