**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**BEST MEDICAL INTERNATIONAL**
**INDUSTRIES INC., a Virginia Corporation;**
**HUESTIS MACHINE CORP., a Rhode Island**
**Corporation, GUNSTON HALL REALTY, a**
**Virginia Corporation; BEST INDUSTRIES INC.,**          **CASE NO. 1:10cv988**
**a Virginia Corporation and KRISHNAN**
**SUTHANTHIRAN, an individual,**                         **Hon. Liam O'Grady**

      **Plaintiffs,**

**v**

**WELLS FARGO, NA, as successor in interest**
**to WACHOVIA BANK, N.A and**
**J. KENT THOMPSON, an individual,**

      **Defendants.**
_____\

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS FIRST AMENDED COMPLAINT**

                      **BEST MEDICAL INTERNATIONAL INC.** *et al*

                      BY:

                      */s/*_____,
                      Shawn R. Weingast
                      Virginia State Bar No.: 33259
                      James M. Brady, *pro hac vice*
                      Attorneys for the Plaintiffs
                      BEST MEDICAL INTERNATIONAL INC., *et al*
                      7643 Fullerton Road
                      Springfield, VA  22153
                      703 451 2378
                      Fax 703 451 8421
                      sweingast@teambest.com

## PROLOUGE

This case was filed only **after defendants wrongly requested confessed judgments in state court on loans that were always paid on time**  Plaintiffs  borrowed a total of $15,000,000.00 from defendants beginning in 2004. They still owe about $11,000,000.00. Plaintiffs have **never missed a payment. In fact, plaintiffs pay $250,000.00 per month above and beyond the payments required on their term loans.** Despite this repayment record and continued credit worthiness the defendants insist on calling their loans putting plaintiffs businesses and hundreds of jobs in jeopardy.

## INTRODUCTION

This case epitomizes the economic drama that has played out in the United States since 2008 when the banking industry helped take the country to the precipice of financial disaster.  Plaintiffs were recipients of loans from Wachovia Bank which was later taken over by Wells Fargo primarily through an infusion of cash from the American taxpayers in the form of TARP (Toxic Asset Relief Program) Funds. Plaintiff continued to timely make all payments on the loans when Wells Fargo arbitrarily and capriciously decided to stop renewing or extending the yearly notes. Eventually, on July 31, 2009 the  defendant agreed to extend the notes for six months but only if the plaintiffs agreed to provided more collateral than necessary, increased the interest rate and required the plaintiffs to agree to onerous terms such as a waiver of all defenses and rights, waiver of jury trial and is requiring payment of irrational attorney fees in the amount of over 1.2 million dollars. In addition the bank is requiring the plaintiffs pay off the term loans which do not mature until 2016 and 2017 respectively and also demands an exorbitant high six figure prepayment fee. The plaintiff was forced to agree to the onerous July 31, 2009 extension or face foreclosure of its property. The defendant bank has wrongfully filed confessed judgments against the plaintiffs in excess of

2

$12,000,000.00  in retaliation to plaintiff's discrimination claim despite the fact **plaintiffs have never missed a payment and the loans are more than adequately secured**.  Plaintiffs have voluntarily paid $250,000.00 per month toward the principal on the term loans as a measure of their good faith. Defendant still refuses to extend the loans with reasonable terms. The banks actions were unreasonable have no logical business or banking rationale under commonly accepted banking practices.

## THE PARTIES

The Plaintiffs are customers of Wachovia, later Wells Fargo Bank, in two separate and distinct capacities. First, Plaintiffs are debtors of the defendant pursuant to negotiated lines of credit, term loans and loan guarantees. Second, the defendant bank was also a financial advisor to the plaintiffs as a result of a complicated interest rate swap agreement it sold to the plaintiffs. The swap agreement is considered a derivative product because the contract has no intrinsic value other than that which can be derived from the cash value of an underlying asset. Basically, the swap agreement is sold by the bank as a hedge against rising future interest rates. Plaintiffs term loans had variable interest rates. In reality, this product only resulted in a windfall profit for the bank because the real costs were never disclosed nor was the banks precarious financial condition. (Please refer to the '**TRANSACTIONS**' section below for a description of the agreements between the parties).

Best Medical International, Inc. (BMI) has been in existence since 1977. BMI provides medical equipment and products throughout the world. Their products are regularly used to treat cancer for adults and children They also provide state of the art equipment to purify blood of impurities prior to blood transfusions.  Plaintiff Krishnan Suthanthiran is the President of

Defendant corporations.  He was born and raised in Tamil Nadu, the southernmost state in India where the poverty rate is significant. Despite a successful scholastic career he was unable to afford college until a friend of the family agreed to provide financing. He attended college in Ontario, Canada and eventually earned a Master's Degree in Mechanical Engineering. His experience as a medical engineer working with oncologists led him to found an International Company supplying novel medical devices that effectively treat cancer and other diseases. In 2007, Mr. Suthanthiran established the CURE Foundation with the goal of providing efficient, non profit, self sustaining medical centers throughout the world at costs significantly below today's standards.  Mr. Suthanthiran has also founded or acquired other companies including  the co-plaintiffs Huestis Machine Corporation, Gunston Hall Realty Corporation and Best Industries, Inc.

Mr. Suthanthiran has also personally guaranteed the loans that are subject to this litigation.

## THE TRANSACTIONS

The Plaintiff, Best Medical International, Inc., initially agreed to borrow $3,000,000.00 from the defendant bank (then Wachovia bank, N.A.) on October 29, 2004. The line of credit was to mature August 31, 2005 which were routinely extended each year to 2008. Plaintiff Gunston Hall Realty entered into a secured line of credit agreement with Wachovia for a maximum principal amount of $5,000,000.00 on February 7, 2005 and Promissory Note of August 5, 2005. Plaintiff Huestis Machine Corporation entered into an term note with Wachovia on December 1, 2006 for $5,000,000.00 to be paid by December 1, 2016 and a Supplementary term Note also dated December 1, 2006 for 2,000,000.00 to be paid by 2017. The total amount of the principal indebtedness was $15,000,000.00. On December 8, 2006 and February 27, 2007 the defendant bank marketed and sold three (3) interest rate swap agreements to the plaintiffs relative to the Huestis Term Loans. The Huestis loans carried a variable interest rate of per annum equal to one

(1) month LIBOR plus 2.0%, (LIBOR is the London interest rate banks charge each other).  An

interest rate swap is sold as a hedge against rising interest rates. At the time of the Huestis loans

the plaintiff borrower was understandably concerned about agreeing to an interest rate that had

such uncertainty. The defendant bank advised a complicated interest rate swap purchase that

coincidentally earned the bank almost $800,000.00 extra!  An interest rate swap occurs when a

party with a variable rate loan is advised that rates will rise increasing the cost of the loan.

Meanwhile, another party borrows money at a fixed rate and if interest rates go down that party is

paying more than necessary for the capitol. The interest rate swap allows the variable rate party to

trade its unpredictable rate for the certain fixed rate. The parties are playing a zero sum game

where one party's profit comes from the other party's bad luck or wrong guess. Normally, one

might argue that plaintiffs simply guessed wrong when interest rates precipitously fell leaving

them on the short end of the swap. The story however does not end there. In this case, the

counterparty that won the bet was the very bank that sold plaintiffs this swap scheme. In addition,

this bank was on the cusp of complete financial failure and highly motivated to prey on their

customers' fears that rates would rise.  This bank, knew or should have known, that its actions, in

concert with the banking industry, was about to bring the entire monetary system to it knees and

precipitate a worldwide financial collapse the like of which have not been seen in over 70 years. It

was not a stretch for this bank to 'guess' that the interest rates would fall. Their response to the

financial crises was to force well collateralized, timely paying borrowers into foreclosures by

suddenly refusing to extend yearly notes and then agreeing to short term extensions only under

onerous terms and conditions such as were levied upon plaintiffs here. Once the short term

extensions had  expired they could foreclose on the valuable security via confessed judgments and

collect all their money immediately.   Furthermore, it is hardly a stretch to theorize that minorities

would bear the brunt of the banks heavy handed tactics. Financial institutions, Wells Fargo especially, is no stranger to questionable civil rights practices. Plaintiffs should have the opportunity through discovery to learn more about the nature and impact of those practices in this case.

## FACTS

Mr. Suthanthiran had a relationship with Wachovia bank for over 35 years in both a personal and business capacity. In almost four decades of banking with Wachovia his loans were **always** paid on time or early. The bank changed hands several times during the time Mr. Suthanthiran worked with them. Each time bank executives solicited Mr. Suthanthiran to remain a loyal bank customer. In 2004 Wachovia representatives began encouraging the plaintiff to borrow money from their bank. Best Medical International owns two buildings on Fullerton Rd. in Springfield, Virginia that were worth about $3,500,000.00 in 2006. Wachovia offered Mr. Suthanthiran a $5,000,000.00 loan and encouraged him to borrow the money which he did. In 2007 and early 2008, Wachovia representatives, Todd W. Rowley, Senior Vice President, Commercial Division in McLean, VA and Anne Sheahan, Vice President, Commercial Risk Manager of Philadelphia, PA, meet with plaintiff Krishnan Suthanthiran and other team members at Best and offered to provide a $20 million line of credit. They even offered to make this a multi-year loan that we could use for acquisition and operating capital. This was intended to replace the current $3 million line of credit. They also charged Best a review fee of approximately $25,000. However, these individuals failed to inform Mr. Suthanthiran that Wachovia was in serious financial trouble and there was a distinct possibility of bankruptcy. Wachovia's representatives knew, or should have known this information. If it were not for this, Plaintiffs would have pursued a relationship with other banks when the financial markets were eager to lend money to businesses

such as the plaintiffs.

In December 2007 and January 2008 Wachovia offered to finance a building plaintiffs were purchasing and provide a loan of $6 million with a first mortgage on this property as a 10 year term loan.  As a result of this, plaintiffs withdrew an application and rejected an offer from National City Bank of Pittsburgh for a $6 million loan.  During this time Wachovia again failed to tell plaintiff that the bank was in serious financial trouble and that there was a distinct possibility of bankruptcy.  If it were not for Wachovia's offer, plaintiffs would have obtained a $6 million loan from National City for the acquisition.

On or about December 31, 2008 Wells Fargo bank took over operations of Wachovia. Defendant Mr. J. Kent Thompson took over as the bank's representative servicing the plaintiffs loans. Prior to this the loans were always extended and payments were always made timely or early. Mr. Thompson had clear animosity toward Mr. Suthanthiran that he did not demonstrate when communicating with non minority executives at Best Medical. There were also documented attempts to persuade Mr. Thomspon to act in a  more professional and reasonable manner when dealing with Mr. Suthanthrian. On May 6, 2010 the plaintiffs General Counsel wrote to Mr. Thompson asking to meet with the person with the authority to approve the yearly loan extensions, See Exhibit 7, First Amended Complaint). . He went on to articulate why Mr. Thompsons position was so unreasonable. Plaintiffs were paying $250,000.00 extra per month on the term loans, Plaintiffs never missed a payment, the collateral  on the loans was worth about $6,000,000.00 more that the loan principal and the interest the plaintiff was paying since the July 31, 2009 agreement were outlandishly unconscionable given the current rates. Yet, Mr. Thompson still refused to extend the yearly notes and was threatening to call the term notes not due until 2016. Discrimination is a logical conclusion when viewing these facts together.    Wells Fargo received

approximately 25 billion dollars from the federal government TARP funds which was presumably used to take over Wachiovia. On February 26, 2010 Mr. David Hoyt, Wells Fargo Head of Wholesale Banking testified before the House Financial Services Committee and the House Small Business Committee and represented that the company is 'making credit available to credit worthy borrowers'. The plaintiffs were in fact creditworthy customers with an excellent repayment record.

Mr. Thompson agreed to a nominal six month extension on July 31, 2009 but only if the plaintiffs increased the collateral, paid more interest, waived their rights to jury a trial and released all claims against the bank. The plaintiffs had no choice but to accept this false choice. They either signed the document or their property went into foreclosure seriously affecting their existing contracts, their ability to execute future contracts and put over 400 jobs at risk.

Why would Mr. Thompson and Wachovia refuse to extend the loans as written when they were adequately secured and being paid on time or early?  Plaintiffs' experts claim there is no reasonable or even rational business purpose for the defendants' failure to extend the loans. The answer to that question is clear. The answer is discrimination, hubris and greed fueled by fraudulent concealment.  As a result, the instant complaint was filed with the court alleging race and national origin discrimination by Defendants Wachovia and J. Kent Thompson, Fraud and/or Constructive Fraud; Equitable Estoppel; Economic Duress; Breach of Fiduciary Duty and Negligence. Moreover, the defendants filed confessed judgments in retaliation days after Mr. Suthanthiran complained about their discriminatory actions.

## ARGUMENT

### I.   LEGAL STANDARD

The rationale for a motion to dismiss pursuant to FRCP 12(b)(6) is well described in *Edwards v City of Goldsboro,* 178 F.3d 231, 244 (4th Cir. 1999) which states:

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; "importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses", *Republican Party of North Carolina v Martin,* 980 F.2d 943 (4th Cir. 1992). Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. See id. ***Furthermore, when as here, a Rule 12(b)(6)motion is testing the sufficiency of a civil rights complaint, "we must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged*.*" Harrison v. United States Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir.1988)  (emphasis added).

In fact, in *Edwards, supra* the court reversed the district court's dismissal of the plaintiff' civil rights claims pled in very general terms pursuant to 42 U.S.C. 1983.

The defendant correctly quotes the recent U.S. Supreme Court Decisions of *Bell Atlantic Corp. v Twombly,* 550 U.S. 544 (2007) and  *Ashcroft v Iqbal,* 129 S. Ct. 1937 (2009) as controlling precedent relative to the sufficiency of a complaint in a  Rule 12(b)(6) motion however fails to complete the analysis required by those cases.  *Twombly, supra* notes that the Federal Rule of Civil Procedure 8(a)(2) still requires only;

"a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99. [While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid.; *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (CA7 1994), a plaintiff's obligation to provide the [127 S. Ct. 1965] "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932.

In *Ashcroft, supra* the Supreme Court noted that because the case alleged constitutional violations against individual office holders the plaintiff was compelled to plead how each government official violated the constitution.  The case was pled as a *Bivens* style constitutional violation claim alleging that the then U.S. Attorney General 'detained thousands of individuals based on their race, national origin or religion. The court held that because respondeat superior

liability was not available in a *Bivens* constitutional claim the plaintiff was required to plead facts that demonstrated 'purposeful intent to disregard the plaintiff's civil rights'.  Such is not the burden in the case at bar however plaintiff contends that the factual allegations contained in the First Amended Complaint are enumerated, specific and far in excess to mere legal conclusions or a recitation of claim elements. The court went on to identify a two pronged process in determining the sufficiency of a complaint. First was to assume the veracity of the well plead factual allegations. Second, do the well plead factual allegations plausibly give rise to an entitlement of relief.  An evaluation of each count in the First Amended Complaint demonstrates specific facts supporting a plausible claim against each defendant. paragraph 31 of the First Amended Complaint provides the factual allegations necessary to allow the court to plausibly conclude that Wells Fargo Bank violated the Virginia Equal Credit Opportunity Act. Likewise, paragraph 45 of the First Amended Complaint articulates specific factual allegations supporting a plausible claim fro which legal relief can be granted against Mr. J. Kent Thompson as an individual defendant as allowed by the Virginia statute, *See Va Code 59.1-21.21:1,* known as the *Virginia Equal Credit Opportunity Act.* The two pronged test set forth in *Ashcroft, supra* confirms the plaintiffs' position in this regard with all the counts contained in the First Amended Complaint.

Finally, defendant misapplies T*rigon Ins. Co. v Columbia Naples Capital, LLC,* 235 F. Supp. 2d 495, 499 n. 2 (E.D. Va. 2002) cited in support of their contention that the court need not accept allegations as true that are contradicted by written documents referenced or attached to the complaint. In *Trigon, supra* the court poited out in a footnote that there was a contradiction between the plaintiff's contention that a defendant was a party to a contract and the contract document itself. Therefore, the court concluded that it need not accept the allegation as true. Here, the plaintiffs are contending the contract language is the result of fraud and duress and the

provisions the defendant relies upon are null and void and the defendant should be estopped from enforcing the contract.   Plaintiff does not contend the existence of the words in the contract but their enforceability. Therefore, the courts assumption that the plaintiff's pleadings are factually true should remain in effect.

## II.     CHOICE OF LAW

Plaintiff does not contest the defendants' position that Virginia law applies. Plaintiff however reserves the right, should the accompanying remand be rejected, to request leave of court to amend the complaint to add counts alleging federal law violation(s) which could not be brought in state court.

## III.     DEFENDANTS' MOTION TO DISMISS THE COMPLAINT SHOULD BE DENIED IN ITS ENTIRETY.

### A.     PLAINTIFFS HAVE SUFFICIENTLY PLED A PRMA FACIE CASE OF A VIOLATION OF THE VIRGINIA EQUAL CREDIT OPPORTUNITY ACT AS TO BOTH DEFENDANTS.

Contrary to defendants implied contention the Virginia Equal Opportunity Credit Act (VECOC) is not intended primarily for 'consumer' transactions or to prevent only 'gender discrimination'. The statute's focus is much broader and defined by *Capitol Indemnity Corporation v Aulakh,* 313 F.3d 200 (4th Cir 2002) as follows:

By their terms, these statutes only govern credit transactions between statutorily-defined credit applicants and creditors. The animating principle of the ECOA and its state analogues is to prevent discrimination against those applying for credit. As such, they contain broad anti-discrimination provisions that "make it unlawful for any creditor to discriminate against any applicant with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1); Va.Code Ann. § 59.1-21.21:1(a)(1).

### 1.     Plaintiff's have stated a valid claim of Race Discrimination against Wells Fargo Bank in violation of the Virginia ECOA.

Plaintiff has in fact sufficiently pled their discrimination claims in

accordance with *Iqbal, supra* and *Twombly, supra.* The First Amended Complaint states a valid, and factually supported, race discrimination claim against Wells Fargo at Paragraph 31 of the First Amended Complaint. These allegations on their own are sufficiently pleaded facts that, if true, would  plausibly result in relief to the plaintiff.  The instant complaint established the following factual background. That Mr. Suthanthiran is a member of a protected class buy virtue of being of Indian descent. That in the past, prior to Wells Fargo's involvement with the plaintiffs all loans were reasonably extended or renewed because the payments were timely or made early. In addition, it is alleged that Mr. Suthanthiran remained credit worthy and this factual allegation is given credence by the plaintiffs banking expert opinion. Defendant can not now allege that the plaintiffs' credit worthiness is a mere conclusion  this credit worthiness is also has factual support in the allegation that indicates the plaintiffs have two term sheets from other credit institutions who did in fact find Mr. Suthanthiran and his companies to be credit worthy. The plaintiff has the following factual pattern alleged throughout the complaint; (1) plaintiff paid all their debts early and on time;  (2) the plaintiffs security is reasonably adequate relative to the loan amounts; (3) the plaintiffs are sufficiently credit worthy for other lending institutions (4)  the defendant bank, prior to Mr. Thompson's involvement, always extended or renewed the loans without difficulty (5) the  plaintiffs' banking expert believes the banks actions did not conform to reasonable, generally accepted banking standards or principals when requiring the Waiver and Amendment Agreement of July 31, 2009 and swearing out confessed judgments against the plaintiffs; (6) the bank ignored the plaintiffs' request for a new servicing manager and ignored Mr. Suthanthiran's overt complaints of race discrimination (7)   Mr. Thompson personally demonstrated animosity and hostility to Mr. Suthanthiran by communicating in a loud, rude offensive manner while communicating with non minority persons in a respectful manner and (8) Defendant Wells Fargo

filed the Confessed Judgments a mere 3 business days after  Mr. Siuthanthiran's complaint of race discrimination. Add to this the allegations derived from studies completed in other lawsuits that Wells Fargo loan practices had a disparate impact on minority borrowers and neighborhoods it seem illogical to conclude that the complaint has insufficient factual allegations that would result in a plausible chance of recovery. Even if Wells Fargo attempts to counter the above allegations by claiming their denial of credit was for reasonable business purposes the plaintiff has still plead that any such claim is a pretext for discrimination. Pretext can be demonstrated by showing the defendants' proffered reason(s) for the credit denial is not worthy of credence. The above factual scenario certainly renders such an explanation highly plausible,  *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In fact, defendants action were contrary to a reasonable banker applying reasonable banking standards, (See affidavit at Exhibit 1).  In addition the plaintiff also makes the allegation that the swearing of the confessed judgments were **retaliatory.** These judgments were filed a mere six days after plaintiff Suthanthiran's letter to Mr. Thompson complaining of race discrimination, (See Exhibit 8 of the First Amended Complaint). Retaliation has long been available as a cause of action in employment related discrimination cases, *See Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir.2001) (citing *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). By analogy, there is no logical reason to prevent them in this context which pertains to Virginia's Equal Credit Opportunity Act which parallels the federal law.

Defendant next claims that corporations can not be victims of discrimination.  The corporate plaintiffs are legal fictions but they act through people such as Mr. Suthanthiran who in this case is a member of a protected class of persons.  Mr. Suthanthiran can in fact be discriminated against by the bank and the resultant harm comes upon the corporations operations

and business as well as Mr. Suthanthiran personally. In fact, corporations have constitutional and statutory rights which can be abridged by wrongful conduct, *See Citizens United v Federal Elections Commission, No 08-205 U.S. 1-21-10 and First Nat. Bank of Boston v. Bellotti*, 435 U. S. 765, 778, n. 14 which established First Amendment rights for corporations. It should be noted that plaintiff corporations are not publicly traded companies but are solely owned by Mr. Suthanthiran.

> **2.      Plaintiff's have stated a valid claim of Race Discrimination against J. Kent Thompson in violation of the Virginia ECOA.**

The Virginia Equal Credit Protection Act (VECPA) is designed to prevent race and /or national origin discrimination from occurring in the applying for or the provision of credit in the Commonwealth of Virginia. The Act defines a 'creditor' as **any person** who regularly extends, renews, or continues credit; **any person** who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit, See Va Code 59.1-21.2(c).

The Act further defines the term person to mean **a natural person**, a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association, See Va Code 59.1-21.20(d). Therefore, the statute clearly contemplated that individuals such as Mr. Thompson would have individual liability for their actions related to the provision of credit. Legislatures are presumed to act with purpose so that every phrase in a statute is given particular importance. Thus, this Court is "obliged to give effect, if possible, to every word" used in the VECPA, *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) , and all parts of the statute must be construed so that each part has meaning, *United States v. Snider,* 502 F.2d 645, 652 (4th Cir.1974). "It is a cardinal principle of statutory

construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).

In addition, the complaint also puts forth specific acts of wrongdoing allegedly committed by Mr. Thompson that are clearly ultra vires acts not consistent with the scope of his employment as a senior vice president of the bank. For example, the First Amended Complaint  alleges at paragraph 45 that the Defendant (referring specifically to Mr. Thompson) discriminated against the plaintiffs on the basis of race and/or national origin in the following particulars:

> a.    That Mr. Thompson demonstrated animosity while negotiating with Mr. Suthanthiran  by communicating in a loud, rude, offensive manner whereas his communications and negotiations with non minority persons were respectful and business like. Such behavior is an ultra vires act not necessarily within the scope of employment with Wells Fargo bank.

Here, the defendant seems to be arguing that overtly rude and aggressive behavior motivated by animosity toward minority customers is within the scope of Mr. Thompson's employment at Wells Fargo Bank.    The doctrine of *respondent superior* will apply only when the "employee was performing the employer's business and acting within the scope of the employment when the tortious acts were committed." *Giant of Md., Inc. v. Enger,* 257 Va. 513, 515 S.E.2d 111, 112 (1999). ***It is well established that under Virginia law the issue of scope of employment is for a jury to decide,*** *Stith v Thorne,* 488 F. Supp. 2d 534, 552  (E.D. Va 2007). *See also, Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,* 453 S.E.2d 261, 249 Va. 39 (Va., 1995). The issue is therefore not appropriate for a Fed.R.Civ Pro. 12(b)(6) motion.

In the context of discrimination claims the Supreme Court has expressly rejected the use of "principles of respondeat superior or constructive notice" for imposing liability on a school district or employer under Title IX,  *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 286 (1998) at

285. Rather, the Court held in *Gebser* that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district's] behalf has actual knowledge of discrimination" and is deliberately indifferent to it. Id. at 290.  As the Fifth Circuit phrased the test in a pre-Gebser ruling, a school district can be liable for teacher-student sexual harassment under Title IX ***only*** if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so,  *Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 660 (5th Cir. 1997).  Similar results have occurred for non governmental employers as well.  Defendant employers are typically arguing they are not liable for their employees discriminatory behavior and the courts have generally favored their efforts to escape responsibility for their employees egregious acts of discrimination.  In the sexual harassment realm,  the employer is not vicariously liable and can be held accountable ***only*** if the plaintiff proves that the employer itself was negligent in failing to take effective action to stop harassment about which it knew or should have known, *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003), (en banc).  Is the defendant Wells Fargo admitting that it had 'knowledge of Mr. Thompson's racial animus'?  In order for the defendant Wells Fargo to be held vicariously liable for Mr. Thompson's actions they will have to admit they knew, or should have known, of his specific actions toward Mr. Suthanthiran.   Finally, defendants conclusion that Mr. Thompson is not a 'creditor' as defined by the act is without merit. Mr. Thompson is the party that signed the offensive Waiver and Amendment Agreement of July 31, 2009. Plaintiffs wrote Mr. Thompson on May 6, 2010 asking to meet with the individual who 'has the authority to approve an extension agreement'. Mr. Thompson ignored the letter leaving plaintiff to reasonably believe he was the responsible party. The statute defines a 'creditor' as one

who regularly 'arranges' for the extension, renewal or continuation of credit. The statute does not require the creditor have the final authority to approve the credit application, (Please see Exhibit 7 in First Amended Complaint).

### B.  PLAINTIFF HAS PLED A PRIMA FACIE CASE OF FRAUD AND/OR CONSTRUCTIVE FRAUD

Defendants correctly recite the elements of fraud however fails to accurately apply them to the facts as pled in the complaint. A misrepresentation can be communicated in a variety of ways and not solely by a verbal statement. For example, fraud can be established by concealment of a material fact or by conduct, *Norris v Mitchell,* 255 Va 235, 241; 495 S.E.2d 809, 912 (1998). An action for fraud by concealment, whether accomplished by word or conduct, may be the equivalent of a false representation. This is because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth. A contracting party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud, *Van Deusen v. Snead,* 247 Va. 324, 328, 441 S.E.2d 207, 209 (1994), and Spence v. Griffin, 236 Va. 21, 28, 372 S.E.2d 595, 598-99 (1988).

According to Virginia law concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert,* 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984). National Airlines, Inc. v. Shea, 223 Va. 578, 583, 292 S.E.2d 308, 311 (1982).

In 2007 and 2008 the defendant bank attempted to induce the plaintiff Krishnan Suthanthiran to agree to borrow money to finance a building and other corporate acquisitions, (paragraph 51, 52). These inducements were based upon the plaintiffs' overall credit worthiness and excellent payment history. Relying upon Wachovia's offer Mr. Suthanthiran withdrew it's

application and rejected an offer to borrow six million dollars from National City Bank of

Pittsburgh. Feeling secure about funds being available from Wachovia  Mr. Suthanthiran used cash

reserves to purchase the building. Wachovia however did not disclose that they were on the brink

of bankruptcy. Their offer to loan more funds reasonably induced Mr. Suthanthiran into a false

sense of security about the availability of financing for his business operations. As a result, he was

damaged when he decided to reject financing from National City Bank and use his cash reserves

for his building purchase. Therefore, the elements of fraud are met.  These elements include a (1)

misrepresentation of (2) material fact made (3) intentionally with (4) intent to mislead (5)

reasonable reliance by the party misled and (6) damages. Constructive Fraud included the same

elements except the misrepresentation is negligent as opposed to intentional, *Jackson v Seymour,*

193 Va 735; 71 S.E.2d 181 (1952).  Each of these elements can be identified as follows:  The

defendant bank committed a  (1) misrepresentation when they refused to divulge the fact they

knew, or should have known, they were close to insolvency when they offered to lend money. The

facts the defendant failed to divulge were also (2) material facts  because it is alleged that had Mr.

Suthanthiran been aware of Wachovia's financial straits he would have refrained from

withdrawing his application to borrow, and rejecting an offer to lend from National City Bank. The

failure to disclose this information about the banks financial status was (3) intentional (4) with

intent to mislead or negligent. Wachovia Bank was heavily involved in high risk mortgage

securities and other questionable derivative products for several years before their ultimate

collapse. If their failure to disclose the fragile nature of their financial status was intentional than

fraud is the proper legal theory. If their failure to disclose the information was negligent, (i.e.

Wachovia should have known their vast financial empire was about to implode) the proper theory

is constructive fraud. Mr. Suthanthiran also (5) reasonably relied on the false sense of security

provided by Wachovia when they failed to divulge their true financial position. This reliance was demonstrated by plaintiffs rejection of offers to borrow money from other banks. Confident financing would be available from Wachovia if needed Mr. Suthanthiran decided to use his own cash reserves for capitol purchases.

Defendant's next rely upon the waiver and release provisions of the of the Waiver and Amendment Agreement of July 31, 2009.  These very provisions however would be null and void or rescinded if the plaintiffs prevail on their complaint. As stated in *Jackson, supra* 'equity is alert to seize upon the slightest circumstances indicative of fraud, either actual or constructive'. The court held that rescission of the agreement between the parties is the appropriate remedy when a party is victimized by fraud. In addition, the release and waiver provisions were the result of the defendants discriminatory practices economic duress because Mr. Suthanthiran's consent was a result of 'wrongful acts or threats that overcame the plaintiff's free will. Rescission is also a proper and just remedy for duress, *Bond, supra.*

Furthermore,  the Waiver and Amendment Agreement of July 31, 2009 relied upon by the defendants is tainted by duress and fraud. As a result, this  provisions are *unconscionable.* The court stated  in *Smyth Brothers v. Beresford,* 128 Va. 137, 104 S.E. 371 (1920), the principles that we apply when determining whether a contract is unconscionable. Virginia allows the courts to void a contract on the ground that it makes an unconscionable bargain. An inequitable and unconscionable bargain has been defined to be 'one that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other.' The inequality must be so gross as to shock the conscience, *Management Enterprises, Inc. v Thorncroft, Inc.,* 243 Va 469; 416 S.E. 2d 229 (1992). While this language is strong it depicts the desperation a party must experience in order to acquiesce to the onerous and draconian contract

terms spelled out in the agreement and reproduced by the defendant in their brief.   If one evaluates the entire contexts of the circumstances the plaintiffs are clearly in the unenviable position of simply having no rational choice at the time but to accept the agreement as required by the bank. Under Virginia law, an "adhesion contract" is defined as a "standard form contract, prepared by one party and presented to a weaker party—usually, a consumer—who has no bargaining power and little or no choice about the terms." *Schwam v. XO Communs., Inc.,* No. 05-1060, 2006 U.S.App. LEXIS 7428, *5-6 (4th Cir. Mar. 24, 2006) (citing *Philyaw v. Platinum Enters.,* 54 Va. Cir. 364 (Va.Cir.Ct.2001)). Plaintiff had no bargaining power here. In fact, it can be reasonably concluded that the defendants real objective was to get the plaintiffs into a foreclosure action.

Defendant next mistakenly asserts that a fraud allegation can not be based on a future expectancy or opinion. The case law as cited by the defendant however states that an expression of opinion, unfulfilled promise or statement regarding future events if made with an intent to deceive or mislead is it actionable as fraud. *See, Colonial Ford Truck Sales v. Schneider,* 228 Va. 671, 676, 325 S.E.2d 91, 94 (1985).*; Sea-Land Service, Inc. v. O'Neal,* 224 Va. 343, 351, 297 S.E.2d 647, 651-52 (1982) and *Woodring v. Bd. of Grand Trustees*, 633 F.Supp. 583 (W.D. Va., 1986). The intent to deceive is clearly evident in both the Fraud (Count III) and Breach of Fiduciary Duty (Count VI) counts of the First Amended Complaint. All fraud complaints contemplate a future event that was hoisted upon an unsuspecting plaintiff because they were 'set up' by a false representation or concealment of a material fact. To merely claim that the plaintiffs damages were not suffered until a later  period of time is an insufficient defense.

Despite the aura of certainty expressed by the defendant the court has not established a bright line test to ascertain whether false representations constitute matters of opinion, expectancy or statements of fact." 251 Va. at 293, 467 S.E.2d at 781.  Instead, "each case must in a large

measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances." *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 562, 95 S.E.2d 207, 211 (1956)

The Defendant also incorrectly claims that the plaintiffs' fraud allegations are overly vague and lack the specificity required by law.  Fraud is a conclusion of law from facts, and 'it is a well settled rule of pleading, both at law and in equity, that the facts out of which the fraud arises must be alleged as well as proved to justify relief on that ground*, Koch v. Seventh St. Realty Corp.*, 135 S.E.2d 131, 205 Va. 65 (Va., 1964). The Fraud alleged here is threefold: First, the bank's failure to disclose their true financial situation while offering to sell swap derivatives that profited the bank at the expense of plaintiff. Second, the bank failing to disclose the true cost of the swap agreement  Third, the bank's conduct of  regularly lending money to the plaintiff while routinely extending yearly notes and then abruptly stopping that practice despite  the plaintiffs obvious credit worthiness. The bank intentionally allowed plaintiff to believe they were secure in a predictable and mutually beneficial lending relationship. In reality plaintiffs were being lulled into a false sense of security until 2009 when defendant unexpectedly stopped extending the yearly notes, called the term notes on a technical deficiency and forced the plaintiffs into signing the onerous Waiver and Amendment Agreement which they are now using to foreclose on the loans.

## C.   PLAINTIFF HAS A VALID EQUITABLE ESTOPPEL CLAIM

Defendant correctly contends that estoppel is a 'well established concept invoked by courts to aid a party, who in good faith, has relied, to his detriment, upon the representations of another, *Contee Sand & Gravel Co. v Reliance Ins. Co.,* 209 Va. 672; 166 S.E. 2d 290 (1969). Defendant incorrectly concludes however that the pleading is only applicable to defendants as an affirmative

defense. Estoppel is frequently pled by plaintiffs in anticipation of, or to contest a defense which is how plaintiffs have utilized the claim in this case.   Estoppel is an equitable remedy that is pled when traditional legal remedies are inadequate and justice requires relief. Here, it is plead as an alternative to fraud and/or constructive fraud should the facts ultimately ascertain that the technical elements of those legal claims can not be met. The courts have recognized that a rigid reading of the law sometimes results in an outcome that is intrinsically unfair to one of the parties. Plaintiff's frequently allege that the enforcement of a statute of limitations should be estopped because of representations made by the defendant, *See Lucas v United Airlines, Inc.*, 282 F.3d 296 (4th Cir., 2002). Plaintiffs also allege estoppel in order to prevent enforcement of the literal provisions of a lease or contract,  *Sentara Enterprises, Inc. v CCP Associates,* 243 Va. 39; 166 S.E. 2d 595 (1992). Estoppel is available to any party who changes his position because of a representation, silence or conduct by another. It is not necessary that the representation be fraudulent and it certainly not necessary that the party be designated only as the defendant,  *Heath, et. al. v Valentine, et. al,*  177 Va. 731; 15 S.E.2d 98 (1941) .  Estoppel arises where one, by his conduct, lulls another into a false sense of security and into a position he would not take only because of such conduct, *Miller & Co. v Lyons,* 113 Va. 275; 74 S.E. 194 (1912). Here, the defendant is attempting in state court to enforce the Waiver and Amendment Agreement against the plainiffs and foreclose on various properties and businesses.   Plaintiff is attempting to defend against this action by asserting defendant should be equitably estopped from enforcing this agreement. Estoppel is appropriate here because the complaint exposes three meaningful 'representations' to the plaintiffs from the defendant. (1) Defendants past conduct of routinely extending the loans; (2) Defendant failed to disclose its true financial health in 2007 and 2008 while it encouraged plaintiff to borrow yet more money from the defendant and (3) Defendants

had a conflict of interest when they sold plaintiff the interest rate swap derivative products as a hedge against rising interest rates. The interest rates fell and the defendant profited significantly as a result of the sale. In fact, the defendant bank would have also profited had the rates stayed the same. The bank made a significant profit the very first day of the swap sale without disclosing this to the plaintiffs, (See affidavit at Exhibit 1,  para 10(C).   The plaintiff relied upon the above representations and changed it plans by forgoing other lending opportunities and spending their own cash reserves because they were confident that the Wells Fargo loan extensions and future financing would be available. When the defendant bank abruptly stopped extending the yearly notes and threatened immediate foreclosure on the plaintiffs' businesses and property they had no choice but to accept the 'take it or leave it' onerous Waiver and Amendment Agreement of July 31, 2009 which significantly raised the interest rates, increased the collateral requirements, waived basic rights, released all claims and included significant pre payment penalties, unconscionable attorney fees of $1.2 million and the confessed judgment provision. When this agreement expired in January 2010, the defendant bank filed their confessed judgment and are now attempting to collect on their required collateral; collect the pre-payment penalty on the term loans that do not mature until 2016 and 2017; collect almost $800,000.00 in extra interest payments because of the swap agreement sold under a conflict of interest cloud; take over the plaintiffs businesses in a state foreclosure action and then charge plaintiff a $1.2 million attorney fee for their trouble. The court is asked to keep in mind that these actions are being taken **on performing loans!   The plaintiffs have yet to miss one** *payment!* In fact, plaintiff is paying ***an extra $250,000.00 toward the principal of the term loans as a gesture of good faith toward the bank yet they refuse to extend the loans as in the past.*** If ever equitable relief should be available to an innocent plaintiff caught

in maelstrom of a worldwide financial crises this case is it. Meanwhile, the bank should not be able to profit from its predatory actions as described above.

### D.   PLAINTIFFS HAVE STATED A CAUSE OF ACTION FOR ECONOMIC DURESS

Virginia law states that duress exists when a person is compelled to manifest apparent assent to an agreement by means of wrongful acts or threats that overcome the persons free will, *Laymon v Kroger Company,* 924 F.2d 1052 (4th Cir., 1991); *Norfolk Division of Social Services v Unknown Father,* 2 Va. App. 420; 345 S.E. 2d 533 (1986); *Bond v Crawford,* 193 Va. 437 (1952). In the First Amended Complaint the plaintiffs alleged as follows:

78.   The plaintiff's relied upon the representations that the loans would be extended as long as the payments were timely made.

79.   Plaintiff continued to make timely payments as required by the loan contracts.

80.   In 2009 the defendant abruptly ceased making the extensions available despite plaintiff making all payments on a timely basis.

81.   In order to prevent foreclosure of its assets and continue its business operations the plaintiffs had to capitulate to the defendants demands and agree to the July 31, 2009 Waiver and Amendment Agreement. This agreement included the onerous confession of judgment provision that heretofore had been stricken from prior agreements as well as waiver of basic rights to a jury trial, release of all claims against the bank and significant interest rate increase.

The plaintiff had no choice but to sign the July 31, 2009 agreement or wrongfully face foreclosure of his properties and businesses. As described above, the defendant's conduct was wrongful when  (1) they refused to extend the loans after routinely doing so in past years; (2) they failed to disclose its true financial health in 2007 and 2008 while encouraging plaintiff to borrow yet more money from the defendant and (3) they failed to divulge a conflict of interest when selling plaintiff the interest rate swap derivative products as a hedge against rising interest rates. The defendant profited significantly as a result of the sale without disclosing the conflict or the

windfall the defendant would recieve. This breached the defendants fiduciary duty toward the plaintiff. These wrongful acts resulted in the plaintiff being placed in a position of having to accept the unconscionable terms of the Waiver and Amendment Agreement or face immediate foreclosure. This was not an arms length business transaction between parties with equal bargaining strength.

**E      PLAINTIFFS HAVE A VALID CLAIM FOR BREACH OF FIDUCIARY DUTY**

Defendant correctly defines fiduciary relationship as one where special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence, *Augusta Mutual Insurance Co. v Mason,* 274 Va. 199; 645 S.E. 2d 290 (2007). This precisely describes the relationship between the plaintiffs and the defendant bank. This is not an arms length lending to borrower relationship as minimized by the defendant. The defendant sold the swap agreement to the plaintiffs. The agreement is a wager that interest rates will rise. Here, the bank stood to make almost $1 million dollars if their customer (the plaintiffs) lost the bet and interest rates dropped. Of course the bank was in a good position to know that rates would fall because they were on the front lines of a financial Armageddon which they helped cause in the first place. That did not stop them from selling the swap agreement from which they will attempt to collect almost $800,000.00 more from the plaintiffs. Even if the rates did not fall and merely remained the same the defendant bank would still make $150,000.00 from the plaintiff. This was never disclosed to the plaintiffs at the time of the sale. These facts are detailed throughout the First Amended Complaint and repeated yet again in paragraphs 85 through 91. The existence of a fiduciary relationship is a **question of fact**, *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 595 (1984) and therefore, under these circumstances should be decided by a jury. Defendant also mistakenly claims that the nexus

between the breach of fiduciary duty and the 2009 Waiver and Amendment Agreement. Requiring

the plaintiff to capitulate to the agreement was in itself a breach of the defendants fiduciary duty to

the plaintiffs and the plaintiffs request in their prayer for relief after paragraph 94 that the

agreement be rescinded as a result of that breach. Also, defendants reliance on the  benign

description of interest rate swap agreements found in *Thrifty Oil v Bank of America,* 322 F.3d 1039

(9th Cir. 2003) is misplaced. Much has happened in the financial markets since 2003 which has

resulted in a tarnished image for interest rate swap agreements.  The issue in *Thrifty Oil, supra* was

whether termination fees incurred upon debtor's bankruptcy constituted interest. In fact, that court

specifically stated:

> Of course, in this case BofA provided *both* the loan and the three
> interest rate swaps, an arrangement that creates a theoretical possibility
> that the periodic swap payments form part of BofA's compensation for
> the risk and delay associated with the term loan …
>
> Finally, the undisputed evidence in the record uniformly points
> away from a disguised transaction or subterfuge.

Here, subterfuge is the central issue of plaintiffs' claims. The court specifically allows for

the possibility that these transactions can be rife with conflict of interest and failure to disclose

allegations.

Defendants statute of limitations claims are also without merit for the following reasons (1)

The statute accrues at the time of breach which was July 31, 2009 when defendant required the

plaintiffs agree to the Waiver and Amendment Agreement; (2) the bank's actions relative to the

swap constituted a continuous violation or breach of their fiduciary duty and (3) the defendants

prevented the plaintiff from becoming aware of their cause of action pursuant to and in violation of

Va. Code 8.01-229(D) and (4) this claim is more akin to a professional malpractice suit and

therefore treated as a breach of contract action which carries a five year statute of limitations.

The statue of limitations accrues at the time of the breach, not necessarily the injury as stated by defendant, *See Tabler v Litton Loan Servicing, LP,* No. 3:09-cv-146, Document 29, page 6 (E.D. Va., August 12, 2009).   The swap transactions which occurred in December, 2006 and February, 2007 are merely the events that established the fiduciary duty, not the breach itself. The plaintiff has alleged that once the duty attached defendants were obligated to act in good faith and with due regard for the interests of the plaintiffs, not themselves. The breach of this duty and damage suffered occurred when defendants forced the plaintiffs to capitulate to the Waiver and Amendment Agreement of July 31, 2010.  This onerous agreement was clearly not in the best interest of the plaintiff and allowed the defendant for begin foreclosure proceedings on performing loans.  Also, the bank profits relative to the swap agreement continued to accumulate each day the agreement remained in effect. The continuing undertaking doctrine operates as a limited exception to the rule requiring strict construction of statutes of limitation. *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 547, 379 S.E.2d 316, 318 (1989); Wilson v. Miller, 104 Va. 446, 448, 51 S.E. 837, 838 (1905). *McCormick v. Romans*, 214 Va. 144, 148, 198 S.E.2d 651, 654 (1973),  "As a general rule, the statute of limitations begins to run against a cause of action at the time of its accrual. But where there is an undertaking which requires a continuation of services, the statute of limitations does not begin to run until the termination of the undertaking." Virginia law has consistently recognized the continuing undertaking doctrine with regard to a continuous or recurring course of professional services related to a particular undertaking, *Keller v. Denny*, 232 Va. 512, 518, 352 S.E.2d 327, 331 (1987).  The courts have applied the doctrine in cases stating claims of breach of contract or negligence involving the professional services of physicians, attorneys, and accountants, *Farley v. Goode*, 219 Va. 969, 976, 252 S.E.2d 594, 599 (1979); *Keller v. Denny*, 232 Va. at 518, 352 S.E.2d at 330; *Boone v. C. Arthur Weaver Co.,* 235 Va. 157, 163,

365 S.E.2d 764, 767 (1988). The statute of limitations in such cases begins to run when the services rendered in connection with a particular undertaking or transaction have ended. These issues raise questions of fact that should be determined after the completion of discovery not the preliminary stages of litigation based solely on the pleadings. Also, professional negligence cases are viewed as breach of contract actions under Virginia Law and therefore carry a five year statute of limitations, *Ranney v Nelson,* 176 Fed. Appx. 405, 409 (4th Cir. 2006); *VMI v King.* 232 S.E. 2d 895 (Va. 1977).

Defendant next argues that a 'lender-borrower' relationship does not create a fiduciary relationship.  As indicated above the sale of the swap agreement made this relationship above and beyond the ordinary banking relationship. The case cited by defendant are not factually relevant. *Rossman v Lazarus,* 1:08cv316 (E.D. Va 2009) ; *Tabler v Litton Loan Servicing , LP,*  No3:09-cv 146 (E.D. Va 2009); *August Mut. Ins. Co. v Mason,*  274 Va. 199, 645 S.E.2d  290  and *Diaz Vicente v Obenauer,* 736 F.Supp. 679 (E.D. Va. 1990) did not even include a swap agreement or even a bank relationship *per se*.  The other cases have no precedential value in this court and do not include the factual allegations relative to the bank negotiating the sale of a derivative product that ultimately benefits the bank while failing to disclose their conflict of interest or precarious financial situation. Defendant cites *St. Matthew's Baptist Church v Wachovia Bank N.A.,* No. 04-4540, 2005 U.S. Dist LEXIS 46607, (D. N.J., May 18, 2005) as support for it's contention that the interest rate swap agreement does not result in a fiduciary relationship.  In *St. Matthew's, supra* however there is no contention that the bank withheld from the plaintiff the fragile condition of the banks financial condition or that if the plaintiff knew of the bank's condition it would have sought funding elsewhere. Here, the bank could easily predict the rates would go down because it had inside information about a coming cataclysmic collapse in the financial market.  The bank

concealed its true financial health, sold a product that was advertised as a hedge against rising rates and now wishes to collect its windfall.

## F.   PLAINTIFFS HAVE PLED A VALID CLAIM FOR NEGLIGENCE

Plaintiff's negligence claim is pled essentially as an alternative to the Breach of Fiduciary Duty claim should the *finder of fact* hold that no fiduciary relationship or duty existed.  The First amended complaint clearly alleges in paragraph 96 that the 'Defendants, as financial advisors, had a duty to act reasonably relative to their interactions with plaintiff.  Virginia recognizes a common law duty to use reasonable care in relation to others, *Mackey v. Miller*, 221 Va. 715; 273 S.E. 550 (Va., 1981).  In addition, Plaintiff identifies the defendants as financial advisors as a result of selling the swap product. This amounts to a professional malpractice claim placing upon the defendants to deliver their service in a manner that meets a standard of care comparable to others in their profession. The negligence count incorporates all prior paragraphs which specifically details the existence of the swap agreement, the nature of the product and that such a transaction by its nature renders the defendant a professional advisor, (paragraphs 87-93 of Fist Amended Complaint).

## IV.   PLAINTIFFS HAVE PLED A VIABLE CLAIM AGAINST MR. THOMPSON INDIVIDUALLY :

Here, defendant merely reiterates the same arguments noted above in Section III (A) (2) of its brief, (Please refer to plaintiff's corresponding opposition). The statute provides plaintiff with an individual right of action against Mr. Thompson. The defendants' blanket assertion that all of his actions were in the scope of employment does not deny the plaintiff his right as affirmatively expressed in the statute. The statute does not provide Mr. Thompson with immunity. The complaint alleges that Mr. Thompson personally treated minority individuals differently than non minorities. His approach to the plaintiffs' loan was also contrary to banking standards and had no

rational business purpose. The plaintiffs have already presented an expert affidavit to the defendant detailing this position and is attached hereto as Exhibit 1. These facts when applied to the specific statute language of the Virginia Equal credit opportunity Act provide a plausible basis for liability on the part of Mr. Thompson individually.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this honorable court to

1.      Deny the Defendants motion in its entirety and award plaintiff attorney fees and costs relative to drafting and arguing this motion, ***or in the alternative***

2.      Allow Plaintiffs an opportunity to amend their complaint so as to correct any pleading deficiencies the court may require.

**BEST MEDICAL INTERNATIONAL INC.** *et al*

BY:
*/s/*_____,
Shawn R. Weingast
Virginia State Bar No.: 33259
James M. Brady, *pro  hac vice*
Attorneys for the Plaintiffs
BEST MEDICAL INTERNATIONAL INC., *et al*
7643 Fullerton Road
Springfield, VA  22153
703 451 2378
Fax 703 451 8421
sweingast@teambest.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 18th day of October, 2010 I will electronically file the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system. I further certify that on the 18th day of October, 2010 I will send the foregoing by regular, First Class, U.S. Mail, postage prepaid to:

Mary Catherine Zinsner
S. Mohsin Reza
TROUTMAN SANDERS, LLP
1660 International Drive, Suite 600
McLean, Virginia  22153

**BEST MEDICAL INTERNATIONAL INC.** *et al*

BY:

*/s/*_____,
Shawn R. Weingast
Virginia State Bar No.: 33259
Attorney for the Plaintiffs
BEST MEDICAL INTERNATIONAL INC., *et al*
7643 Fullerton Road
Springfield, VA  22153
703 451 2378
Fax 703 451 8421
sweingast@teambest.com